Section first of article first of title sixth of chapter eighteenth of part first of the Revised Statutes, provides for the election of wardens and vestrymen in the Protestant Episcopal Church in this State. The section contains this provision: "At all such elections" (referring, with other elections, to the annual election of wardens and vestrymen), "the rector * * shall preside, and receive the votes *Page 194 
of the electors and be the returning officer, and shall enter the proceedings in the book of minutes of the vestry, and sign his name thereto, and offer the same to as many electors as he shall think fit, to be by them also signed and certified."
It appears that at the election in question, one hundred and thirty-eight votes were cast. Of these, nineteen were for the relators, and one hundred and nineteen were for the defendants. The rector presided at the election, received the votes, acted as the returning officer, entered the proceedings in the book of minutes of the vestry, signed his name thereto, and procured the same to be signed by twenty-seven other persons. In the entry made he certified that it appeared, from a canvass of the votes, that the defendants Lacoste and Guental were elected wardens, and that the other defendants were elected vestrymen. By virtue of this election the defendants entered into the offices claimed by the relators.
The defendants, having received their certificate of election from the rector, are prima facie entitled to the offices in question.
It was the duty of the rector to preside at the election, and "to receive the votes of the electors, and be the returning officer." The presumption is that he did his duty, and received only the votes of electors.
The relators, in order to succeed in this action, must establish, by competent evidence, that, at the election, they, instead of the defendants, were duly elected. The burden is upon them. They must prove, not only that illegal votes were cast for the defendants, but also that if the illegal votes were deducted the defendants had not received a majority. In other words, it was incumbent on the relators to show that the defendants, who held the certificate of election and who were in possession of the office, received less than a majority of the votes of the duly qualified electors voting at the election.
To constitute a legal elector one must be a male of full age, who shall have belonged to the church or congregation *Page 195 
for the last twelve months preceding the election, and must, in addition to these three requisites, have been baptized in the Episcopal Church, or have been received therein, either by the rite of confirmation, or by receiving the holy communion, or by purchasing or hiring a pew or seat in said church, or by some joint act of himself and the rector, whereby he shall have attached himself to the Protestant Episcopal Church.
The plaintiffs, to overcome the presumption created against them by the certificate of the rector, examined eighteen witnesses. The examination of fifteen of them was confined to their own qualifications as electors. One of the remaining three was not examined as to the qualifications of any elector. The two others were examined with reference to the qualifications of particular voters, not exceeding in all thirty, including those who voted for the relators; and these were asked some general questions with reference to the remaining voters as a whole.
One of these witnesses was asked the following question:
Q. "Those other individuals who came up and voted, and did not vote your ticket (i.e., the relators'), had you seen any of them at that church for more than a year preceding that election?"
A. "Not that I recollect."
On his cross-examination he says:
Q. "Do you profess to be able to state from your recollection all you have seen attend there?"
A. "Not by any means."
He gives only his recollection at best.
This is all the testimony given by this witness with reference to the voters not specially named. The other witness swears as follows:
Q. "What persons did you see vote that printed ticket (i.e.,
the defendants') whom you knew personally whether they were voters or not?"
A. "There is only one, I presume, that voted that ticket that is a pew holder." *Page 196 
The presumption of the witness is of no value; and, if it were of value, it only relates to one of a class of equally important qualifications.
The same witness, after referring to several voters by name, says: "All the others I do not know any thing at all about them." This may mean very little, and possibly very much. The witness is then asked the following question:
Q. "You say the residue of those persons were not voters?"
Question objected to by counsel for the defendants. Objection overruled and exception taken.
A. "Yes, sir."
No importance should be attached to this question and answer in considering the evidence in the case. The question was clearly improper. Whether they were or were not voters was a question for the jury, under the instructions of the court, as to what were the qualifications of an elector. It was argued by the appellants' counsel that, inasmuch as the question was asked by the court, no objection or exception could be taken to it. We do not understand that the court has any greater right to ask, against the objections of counsel, improper questions, than counsel have. And if, against objection, he asks improper questions, it is the duty of the appellate court to correct the error.
Again, the witness testifies:
Q. "Do you know that none of the others were pew holders?
A. "There was none of the others."
Again:
Q. "I understand you as saying that none of the others than those that you have named upon the list which you hold in your hand were connected with the church in any way, as attendants, communicants, or pew holders?"
A. "I do not know of any more, to the best of my knowledge."
The witness subsequently testified that they may have been connected with the church, and he might not have known it. *Page 197 
The testimony above referred to is all that there is in the case with reference to the qualifications of about one hundred of the one hundred and thirty-eight voters. We see no reason to reverse the judgment.
The new trial was properly granted, and, under the Code, section eleven, we have no discretion but to direct judgment absolute for the defendants.
Judgment accordingly. *Page 198