# THE

# MISCELLANEOUS REPORTS

OF THE

# STATE OF NEW YORK

COMMENCING JANUARY, 1923

---

CHARLES FISKE, as Bishop Coadjutor and Ecclesiastical Authority, Acting as Bishop of the Diocese of Central New York, Plaintiff, v. ARTHUR H. BEATY and Others, Claiming to be the Rector, Churchwardens and Vestrymen of Grace Church, Cortland, N. Y., and WILLIAM B. DAVIS, Defendants.

Supreme Court, Cortland County, November, 1922 (Received January, 1923).

Religious corporations — canons of Protestant Episcopal church binding when not in conflict with state laws — when ecclesiastical decrees are binding upon the civil courts — the bishop of the diocese may test the title to the office of rector, warden and vestryman in the state courts — vacancy in rectorship — qualification of women voters — injunctions.

The canons of the general convention of the Protestant Episcopal Church of the United States and of any diocese within which they have been adopted are binding upon the bishops, rectors and other officers of said church unless the same are in any way in conflict with the laws of the state.

Where they have jurisdiction the decrees of the ecclesiastical courts of that communion are final as to what constitutes an offense against the discipline of the church and are binding upon the civil courts.

The right and title to the office of rector, warden or vestryman in a Protestant Episcopal church may be tested and determined in an action brought by the bishop of the particular diocese to have it adjudged and decreed that the defendants were illegally elected to office.

Where, upon the recommendation of a committee appointed by the bishop of a diocese to conduct a canonical investigation in accordance with diocesan canon 23, relating to the trial of a clergyman, not being a bishop, the rector, wardens and vestrymen resigned their office, the rector's resignation, however, not to take effect until after opportunity to elect new wardens and vestrymen, it must be held that a vacancy in the rectorship was created by such recommendation, and it cannot be said that there was no vacancy in the rectorship because the new board of wardens and vestrymen had not accepted the rector's resignation, which had already been made to the old board, which it in effect accepted by resigning in compliance with the wish of the bishop, and the rector cannot repudiate his act of resigning after the wardens and the vestry had performed their part of the agreement made between all parties in interest.

At a special meeting thereafter duly called upon proper notice for the purpose of electing new wardens and vestrymen, 144 votes were cast, of which approxi-

mately 100 were of women, and the ticket containing the names of individuals to be elected as the new wardens and vestry, pledged to retain the rector, received 109 votes. Upon the declaration of the result of the election the certificate of the newly elected members of the vestry was prepared, signed and issued, and without the giving of any notice thereof to the bishop, as required by general canon 19 or by diocesan canon 7, the former rector was again elected rector for a term of six months. *Held*, that such election was in contravention of the meaning and spirit of the case as indicated by the action of the committee, and of the bishop, wardens and vestrymen; it was also a repudiation of the agreement between all interested parties and as it was not legalized by any compliance with general canon 19 or diocesan canon 7 the rector neither continued his office nor was he elected to succeed himself. In an action brought by the bishop of the diocese to have it adjudged and decreed that the defendants were illegally elected as the rector, wardens and trustees of the church, *held*, that the plaintiff as the highest ecclesiastical authority within the diocese was entitled to institute the action and that the court had jurisdiction to entertain the same.

A resolution of the vestry recommending that the privilege of voting be extended to women was ratified not at an annual meeting as required by section 46 of the Religious Corporations Law, but at a special meeting, the notice for which did not, as required by section 43 of said statute, specify that such action was to be taken. *Held*, that the procedure to qualify the women to vote at the special meeting called to elect new wardens and vestrymen not having been followed, the voting of women at such meeting was illegal, and the fact that since the date of the ratification of such recommendation women had without objection voted at all annual and special meetings did not in any way legalize their voting at the meeting here in question.

The wardens and vestry by neglecting to elect a rector according to law failed to govern and administer the corporate property which, under section 5 of the Religious Corporations Law, must be administered according to the discipline, rules and usages of the governing church body, and to provide for the conduct of religious services in connection with the property provided for such purpose, and having also failed to perform their duty by the engagement of an unlicensed lay reader, an act forbidden by general canon 25, such violation of duties called for interference by the bishop, who as plaintiff is granted the injunctive relief asked for by the complaint, with costs.

SUIT for an injunction.

*Harold L. Hooker* (*Lusk, Buck & Ames*, of counsel), for plaintiff.

*Hinman, Howard & Kattell*, for defendants.

McCANN, J. The plaintiff is bishop coadjutor and acting as bishop of the Protestant Episcopal Church for the Diocese of Central New York, having succeeded in such position Rt. Rev. Charles T. Olmsted from whom he received a designation to such ecclesiastical authority.

The defendants are respectively the rector, churchwardens, vestrymen and treasurer of Grace Church of Cortland, N. Y., which is a religious corporation, incorporated under the laws of the state of New York. The corporation is the owner of a rectory

and church property located at the city of Cortland, N. Y., in
which church services have been and are conducted under the
canons, rules and regulations of the Protestant Episcopal church.
The church in question is a part of the diocese of Central New
York and as such is subject to and under the jurisdiction of the
ecclesiastical authority thereof and of the diocesan canons, orders,
decisions and decrees of the bishop exercising such authority
within said diocese and is also subject to the canons, rules and
regulations and laws of the general convention of the Protestant
Episcopal church of the United States of which the said diocese
of Central New York is a part.

The so-called canons of the general convention and of the
diocese within which they have been adopted are binding upon
the bishops, rectors and other officers of said church unless the
same shall in any way be in conflict with the laws of the state.

During all of the times mentioned in the pleadings herein, and
covered by the controversy involved in this action, the Rt. Rev
Charles Tyler Olmsted was the duly elected and consecrated
bishop of the Central New York diocese and authorized as such to
perform all the duties of such bishop and until July 1, 1921, was
the duly constituted and ecclesiastical authority of the Protestant
Episcopal church in said diocese. On the last mentioned date,
the plaintiff, Charles Fiske, became the duly designated and con-
secrated bishop coadjutor of the said diocese and on said date the
said Bishop Olmsted released and transferred the ecclesiastical
authority of said diocese to the said Charles Fiske, who ever since
has been the duly constituted ecclesiastical authority of said diocese
and as such exercising authority and jurisdiction over all the
parishes within said diocese including the parish known as Grace
Church of Cortland, N. Y. The defendant Arthur H. Beaty is a
regularly ordained minister of the said church and a resident of
said diocese and as such was and is subject to the authority of the
said diocese and to the discipline of said church as exercised therein.

About the month of September, 1918, the defendant Beaty was
duly installed as rector of said church and acted as such until June
2, 1921. For some time prior to the 8th of December, 1920,
dissatisfaction and dissensions arose within the said parish which
dissensions were with reference to the defendant Beaty as rector.
Many of the parishioners were not satisfied with his rectorship
and administration of the affairs within the parish. By reason
of such dissatisfaction, many of the communicants of said church
refused to support the same or to attend the services therein. On
December 8, 1920, under the provisions of general canon 41 and

of diocesan canon 23, a majority of the individuals of the then churchwardens and vestrymen of said church made a written application to Bishop Olmsted for the dissolution of the pastoral relations between Beaty and the church. Thereafter and on January 14, 1921, Bishop Olmsted addressed the following letter to Rev. Dr. Coddington, one of the ministers of said church:

" *January* 4, 1921.

" MY DEAR DR. CODDINGTON.— Two members of the vestry of Grace Church, Cortland, called on me this morning to discuss the rumors which are afloat concerning their rector, the Rev. Mr. Beaty, and we decided that it would be best to have a canonical investigation in accordance with diocesan canon 23 and I am going to ask you to serve as Chairman of the Committee and suggest that you appoint Rev. Messrs. Hadley and Jaynes and Messrs. Charles W. Andrews and Charles L. Behn of Syracuse to serve with you on the Committee and that you will notify the other gentlemen of their appointment and I will ask you to kindly notify Mr. Beaty of the time and the place.

" Faithfully Yours,
" CHARLES TYLER OLMSTED."

Rev. Dr. Coddington thereupon addressed a letter to defendant Beaty as follows: " SYRACUSE, N. Y., *Jan.* 17, 1921.

" DEAR MR. BEATY.— In accordance with the provisions of Diocesan Canon 23, Bishop Olmsted has appointed a Committee to investigate the rumors concerning you. This Committee, consisting of Rev. H. G. Coddington, Rev. H. H. Hadley, Rev. A. A. Jaynes, Mr. Charles W. Andrews, Mr. Charles L. Behn, all of Syracuse, will meet on Thursday, Jan. 20, at two o'clock P. M., in St. Paul's Parish House, Syracuse. You are asked to meet with the Committee and to bring with you if you wish to do so one or two friends. Your Vestry has been asked to send a representative to meet with the Committee at 2:30 o'clock.

" Faithfully Yours,
" (Signed) HERBERT G. CODDINGTON."

At the time and place indicated in this letter the committee met. No formal charges were prepared but the defendant Beaty was present with four witnesses and five members of the vestry also appeared. Testimony was presented by both sides to the controversy. The extent or nature of such testimony does not appear. The committee thereafter made a written report as follows:

" The Committee appointed by Bishop Charles T. Olmsted to investigate rumors concerning the Rev. Arthur H. Beaty, of Cortland, N. Y., reports as follows:

" A Meeting of the Committee was held in St. Paul's Parish House, Syracuse, N. Y., Thursday, January 20, 1921, from 2:00 P. M. to 6:00 P. M. All the Members of the Committee were present. The Rev. Arthur H. Beaty appeared before the Committee with four witnesses, two ladies and two gentlemen. Five Members of the Vestry appeared before the Committee in opposition to the Rev. Mr. Beaty.

" After hearing all the testimony of both sides, the Committee decided that no charges were sustained affecting the clerical standing and good character of the Rev. Arthur H. Beaty. But, it does appear that there have developed factions in the Parish that are irreconcilable under the present conditions; and, for the best interests of all concerned, the Committee unanimously recommend that under Canon # 39, of the Canons of the General Church, the Bishop, with the advice of the Standing Committee, dissolve the pastoral relation now existing between the Rev. Arthur H. Beaty and Grace Church, Cortland, but with the distinct understanding that such dissolution of the pastoral relation shall be upon the following terms, viz:

" *First*, that the resignation of the Rev. Arthur H. Beaty shall not take effect until after three months from the time of notice given to him by the Bishop; *second*, that before such resignation takes effect the present Wardens and Vestrymen of Grace Church, Cortland, for the sake of harmony, shall individually tender their resignations, and that new Wardens and Vestrymen be elected according to the Diocesan Canon covering such elections.

" Respectfully submitted,
" HERBERT G. CODDINGTON, *Chairman*
" ALMON A. JAYNES
" HENRY HARRISON HADLEY
" CHAS. W. ANDREWS
" CHAS. L. BEHN, *Secretary.*"

At the foot of said report and indorsed thereon Bishop Olmsted wrote and signed the following: " I hereby render my decision that in accordance with the above report the Rev. Arthur H. Beaty resign the rectorship of Grace Church, Cortland, New York, on June 2, 1921, subject to the conditions mentioned in the same report."

On or about March 2, 1921, a written notice of said report and the indorsement thereon of the bishop was sent to the defendant

Beaty and the same was read in the church and thereafter and on or about the 20th day of May, 1921, pursuant to the report and written notice of the bishop the said wardens and vestrymen resigned and on or about the same date Beaty addressed a letter as follows:

"CORTLAND, N. Y., *May* 20, 1921.

"*To the Rector, Wardens and Vestrymen of Grace Church, Cortland, New York:*

"I hereby tender my resignation as rector of Grace Church, Cortland, New York, to take effect on the date set by the Bishop providing that the provisions of his decision have been carried out in full by that date, that is the present Wardens and Vestrymen of Grace Church have resigned and that new Wardens and Vestrymen have been elected.

"(Signed) A. H. BEATY."

Thereafter and on May 31, 1921, a special election of Grace Church was called to elect new wardens and vestrymen. Due and proper notice of the time, place and purpose of such meeting was given. There were present at such election and at the request of the bishop, Dr. Coley, the president of the standing committee of the diocese, and Dr. Coddington, who had been chairman of the special investigating committee above referred to. Prior to the election the defendant Beaty with the assistance of Mr. Lowerre prepared a list of persons who were qualified to vote at such election, which list included the names of women voters. At such election 144 votes were cast, of which approximately 100 were cast by women. Two tickets were before the meeting; one containing the names of the individuals to be elected as the new wardens and vestry, pledged to retain defendant Beaty as rector, and the other, containing the names of the wardens and vestry who were opposed to retaining him. As the result of such election, the ticket containing the names of the new wardens and vestry received 109 votes and the ticket containing the names of the old wardens and vestry, so called, received 35 votes. Prior to the election the list of names as so prepared was posted on the outer door of the church. The election was conducted by the rector and the list of names prepared by him as those who were alleged to be eligible to vote was read before the vote was taken. Of the persons who were named as qualified voters, 64 had no pledges for the support of the parish recorded upon the books of the treasurer and in addition 34 were in arrears on their pledges for more than six months. There were but three or four challenges at such election. It was conducted in an orderly manner. The

result of the election was declared and the certificate of the newly-elected members of the vestry prepared, signed and issued.

Section 1 of diocesan canon 14 reads as follows:

" Male persons of full age belonging to a Parish, who have been regular attendants at its worship and contributors to its support for at least twelve months prior to any election or special meeting or since the establishment of such Parish, shall be qualified voters at any such election or special meeting and also women having the like qualifications may vote at the annual election and special meetings of any Parish whenever such Parish shall so determine in the manner provided in section 46 of the Religious Corporations Law."

Section 46 reads as follows:

" Sec. 46.  *Changing the qualifications of voters and the qualifications of wardens and vestrymen.*  If the vestry of a Protestant Episcopal parish heretofore incorporated shall by resolution recommend that the qualifications of voters and the qualifications of wardens and vestrymen be changed to conform in both cases to the requirements of section forty-three of this chapter, notice of such recommendation shall be included in the notice of the next annual election of such parish, and be submitted to the meeting. If such recommendation be ratified by such meeting the presiding officer thereof and at least two qualified voters present thereat shall execute and acknowledge a certificate setting forth such resolution of the vestry, the fact that notice thereof had been given with the notice of such annual election, and that the meeting had ratified the same.  Such certificate shall be filed in the office of the clerk of the county in which the original certificate of incorporation is filed and recorded."

Section 43 of the Religious Corporations Law, among other things, provides as follows:

" The notice of a special meeting *shall specify the matter or question to be brought before such meeting and no matter or question not specified in such notice shall be acted on at such meeting.*  The presiding officer of such annual or special meeting shall be the rector of the parish, if there be one, or if there be none, or he be absent, one of the church wardens elected for the purpose by a majority of the duly qualified voters present, or if no church warden be present, a vestryman elected in like manner.  Such presiding officer shall be the judge of the qualifications of the voters; shall receive the votes cast; and shall declare the result of the votes cast.  *   *   *   Male persons of full age belonging to the parish, who have been regular attendants at its worship and contributors to its support for at least twelve months prior to such election or special meeting or since the establishment of such parish, shall be quali-

fied voters at any such election or special meeting, and also, whenever so permitted by the canons of the diocese, women having the like qualifications may vote at the annual elections and special meetings of any parish of such diocese, whenever such parish shall so determine in the manner provided in section forty-six of this chapter."

It is claimed that it was illegal for women to vote at said election, also that it was illegal for many to vote who were not qualified by reason of not having been regular attendants at worship and contributors to the support of the church for at least twelve months prior thereto.

The vestry at a meeting held on September 15, 1919, adopted the following:

" Motion made by Mr. Lowerre and seconded by Hubbard that the women have equal voting privileges with the men at the annual meeting. Carried. Adjourned.

" C. J. CADY, *Sec. Pro Tem.*"

At a special meeting of the parish held on November 20, 1919, the following action was taken:

" *Resolved* that the action of the vestry of Grace Church of Cortland, New York, at a meeting held on Sept. 15, 1919, wherein the following resolution was passed ' Motion by Mr. Lowerre duly seconded by Mr. Hubbard that the women have equal voting privileges with the men at the annual meeting. Carried,' be and hereby is approved by this meeting."

Thereupon the certificate of said election was filed in the office of the county clerk of Cortland county, N. Y., where the original certificate of incorporation was filed, but such certificate of election was not acknowledged by the rector and other persons who executed the same.

It appears that at every special and annual meeting of the parish held subsequent to November 20, 1919, women have voted. It is claimed that the authority for women to vote at the special meeting of May 31, 1921, or at any other special or annual election, was not duly granted because of the fact that the resolution to grant such authority was not adopted at an *annual* meeting, and further that even if it should be held that such authority could be legally granted at a *special* meeting of the parish, the notice of such special meeting did not specify the matter and question to be brought before such meeting as required by section 43 of the Religious Corporations Law. It is furthermore claimed that the certificate adopting the resolution authorizing women to vote was not acknowledged, as required by section 46 of the Religious Corporations Law.

The plaintiff attacks the validity of said election, the authority of the wardens and vestrymen selected thereat to hold the offices to which they were respectively elected, and challenges the authority of said wardens and vestrymen to perform any subsequent acts, to wit, the filling of vacancies, the election of a rector, treasurer and clerk. On the first day of June, the day following their election, the newly-elected wardens and vestrymen met and organized by the election of Mr. Beaty as chairman and Mr. Stanley as secretary, at which meeting they elected the defendant Davis as treasurer and Beaty as rector for a period of six months. On the same date the vestrymen notified Bishop Olmsted in writing that they had met and organized and elected Mr. Beaty as rector for six months. On the same date the new wardens and vestry assumed to enter upon the discharge of their duties and from time to time they have elected new officers in the place of those who had resigned and such new officers have also assumed to enter upon the discharge of their duties. The rector Beaty continued to act as such and to exercise the powers and duties of that office until the month of July, 1921, at which time an action was brought in the Supreme Court by four individual members of the church, in which action a temporary injunction was granted which is still in force and which restrains him from performing the duties of rector and also restrains the new treasurer, the defendant Davis, from further exercising the duties of treasurer until the decision of that action. On or about the 8th day of June, 1921, Bishop Olmsted replied to the notification of the election of Mr. Beaty and stated that he declined to ratify such election and refused to accept him as rector of Grace Church. In such communication he stated that his original decision was " to dissolve the pastoral relation now existing between Rev. A. H. Beaty and Grace Church, Cortland. That decision still stands. To consent to the election of the same candidate would nullify it."

The plaintiff as bishop coadjutor refused to recognize the election of the rector and later, after a demand had been made by the bishop upon the defendants that they surrender their offices and turn over the properties of the church to him as ecclesiastical authority of the diocese and after failure on their part so to do, this action was commenced. A judgment is demanded which will adjudicate (in substance) that plaintiff is the ecclesiastical authority within the diocese of Central New York; that the orders and decision of Bishop Olmsted and of the plaintiff be adjudged to be in accordance with the canons, laws and rules of the Protestant Episcopal church; that Arthur H. Beaty is not the rector of Grace Church and is without authority to act in any way or to hold any services in

said church or to exercise any dominion or control over the church or any of its property; that the election of the various church wardens and vestrymen and the officers selected by them as treasurer and clerk be declared illegal and void; that the defendant Beaty is not entitled to the possession of the real estate or the personal property of the church; that he be enjoined from acting in any way as rector or from exercising any dominion or control over the church or its property or from charging or receiving any compensation; that the plaintiff have a mandatory injunction order directing the defendant Beaty to remove from and deliver up said property and to surrender possession thereof; that the defendant Davis be enjoined and restrained from collecting and receiving or disbursing any of the funds of the church; that the wardens and vestrymen be likewise required to surrender possession of any property under their control and be restrained from in any way exercising any authority over the affairs of the church; that they be removed from the offices which they purport to hold, and for such other and further relief as to the court may seem just and equitable.

The election of Beaty at the meeting on June 1, 1921, was not preceded by the giving of any notice thereof to the bishop as required by the provisions of general canon 19 or of diocesan canon 7. The former, among other matters, provides as follows:

" Sec. II. No election of a rector shall be had until the name of the Clergyman whom it is proposed to elect has been made known to the bishop, if there be one, and sufficient time not exceeding thirty days, has been given to him to communicate with the Vestry thereon.

" Sec. III. Written notice of the election, signed by the church wardens, shall be sent to the Ecclesiastical Authority of the diocese. If the Ecclesiastical Authority be satisfied that the person so chosen is a duly qualified minister and that he has accepted the office, the notice shall be sent to the secretary of the convention who shall record it. And such record shall be sufficient evidence of the relation between the minister and the parish."

Diocesan canon 7 contains the following provision:

" Sec. I. Whenever a Church becomes vacant, it shall be the duty of the Vestry to give immediate notice thereof, to the Bishop. Upon the receipt of such notice, the Bishop may within ten days, certify to the Vestry the name or names of one or more Clergymen of this Church in his opinion well qualified to fill the vacant cure, and it shall be the duty of the Vestry to consider such nominations before extending a call to any other Clergyman."

The question here arises whether there was a vacancy in the

rectorship of the church on the 1st day of June, 1921, at the time the defendant Beaty was elected for a term of six months. In my opinion such vacancy existed. The defendants claim that no decision had been made creating such vacancy. There was such a decision, although in my opinion none was necessary. The decision which resulted in the resignation of the rector was not a legal decision based upon a regular proceeding, but was a " decision," in the sense that the bishop accepted the recommendation of the committee as being the best solution of the situation and " decided " that the recommendation should be carried into effect. When so carried into effect it became a " decision." It was a vacancy created by the recommendation that they should resign, to wit, the rector, the wardens and vestry, and the resignations of the wardens and vestry were made upon the assurance that the rector would do likewise; in fact, he had done likewise. He had complied with the bishop's directions, excepting, however, that a part of the agreement was that the rector's resignation should not take effect until after there was an opportunity to elect the new wardens and vestrymen. It cannot be said that there was no vacancy because the new board had not accepted Beaty's resignation. Such resignation had already been made to the old board and they had in effect accepted by resigning, in compliance with the wish of the bishop. The acts of the old board were based on the condition that the rector would likewise comply. It was a mutual agreement recommended by the committee, confirmed by the bishop and complied with by the rector, wardens and vestry and became effective as to the rector on June 2, 1921. The rector cannot repudiate his act of resigning, after the wardens and the vestry had performed their part of the agreement.

It is contended by defendants that the election of defendant Beaty as rector was not a new election but a continuation of his previous rectorship. This is not tenable. It is in contravention of the meaning and spirit of the case as indicated by the action of the committee and of the bishop, rector, wardens and vestrymen. It is a repudiation of the agreement between all parties interested. It was not legalized by any compliance with general canon 19 or diocesan canon 7; therefore, he did not continue his office nor was he legally elected to succeed himself.

General canon 41 establishes proceedings for the dissolution of the pastoral relation and provides that " if the parties be not agreed respecting such separation and dissolution," etc. The language implies that if they be agreed there is no necessity for further procedure. In the instant case they were agreed and their agreement was performed on the part of each party con-

cerned.   It is claimed that the proceedings were not conducted in accordance with the provisions of diocesan canon 23, the first section of which provides for an investigation and a trial to be had on a presentment duly made.   In this case an investigation was made by five persons appointed and in their opinion there was not sufficient ground for the charges or imputation against the character of Beaty and, therefore, there was no necessity for a trial, especially in view of the fact that the compromise offered by the committee and the bishop was accepted by all concerned.   It is urged that the proceeding initiated by the petition of a majority of the vestrymen was not the action of the vestry as a board, but was the individual petition of eight, being a majority of its members, and, therefore, not in accordance with the provisions of general canon 41.   The defendant claims that any action tending to dissolve the pastoral relation must be initiated by the vestry acting as such, in making a petition to the bishop.

General canon 41 designated the vestry as a party who may petition and it is quite probable that the language thus implies action by the vestry as a body.   General canon 41 provides, however, in section 4 as follows:  " This Canon shall not apply to any Diocese or Missionary District which has made or shall hereafter make, provision by Canon upon this subject, nor in contravention of any right of any rector, minister, parish, congregation or vestry under the law of the Civil Authority."

Diocesan canon 23 is entitled " of the trial of a clergyman not being a bishop."

This canon recognizes the right of a presentment by " the major part in number of the members of the Vestry."   This answers the question of the sufficiency of the petition.   However, it matters not under which canon, general or diocesan, the proceeding was initiated or conducted.   The disposition of the matters involved was under the authority of canon 41 by a decision based upon a mutual agreement and resignation, or, if preferable to so designate it, under a " decision " rendered, to be effective upon compliance with certain conditions therein contained, and with which the parties thereafter complied.   If the dissolution of the pastoral relation required certain canonical procedure, it has been followed to the extent of giving the bishop jurisdiction for entertaining such proceeding, and with all interested parties before him. The failure to follow strict compliance as to service of notice of the time and place of hearing and of service of copies of specific charges must be taken to have been waived by the rector's voluntary appearance, participation in the proceedings, submission thereto and, finally, his compliance therewith.

It would seem unnecessary to quote authorities to sustain the proposition that the rector waived any rights that he might have had, but I will refer to *Walker* v. *Wainwright*, 16 Barb. 486, where it is held that the court can only inquire " whether the defendant has the power to act, and not whether he is acting rightly."

It is further said in this case: " Good faith required that if the accused had any objections to the proceedings he should have made them in time; and pointed them out specifically, so that they could have been answered or obviated in due season. Otherwise he could slumber on his objections and after leading his adversary into a protracted contest, and after taking the risk of a decision in his favor, avail himself of them to destroy that in which he has induced the other party to believe he acquiesced. This principle is one founded on good faith and common sense, and prevails in all cases in courts of justice, excepting only where a tribunal is acting without jurisdiction, which consent cannot confer."

Having decided that there was a vacancy on the 2d day of June, 1921, the question arises as to whether or not the filling of such vacancy by the new board was done in a legal manner.

Section I of general canon 19 states that " No election of a rector shall be had until the name of the clergyman whom it is proposed to elect has been made known to the Bishop, if there be one, and sufficient time, not exceeding thirty days, has been given to him to communicate with the Vestry thereon."

Diocesan canon 7, section I, states: " Whenever a Church becomes vacant it shall be the duty of the Vestry to give immediate notice thereof, to the Bishop. Upon the receipt of such notice the Bishop may within ten days, certify to the Vestry the name or names of one or more Clergymen of this church in his opinion well qualified to fill the vacant cure, and it shall be the duty of the Vestry to consider such nominations before extending a call to any other Clergyman."

Such notice was not given. It is claimed that the notice was not necessary because the bishop already knew of the vacancy and that the only result of the failure to give such notice was to prevent the bishop from submitting a list of names for consideration before the election. This provision is independent of that contained in general canon 19 where it is stated that no election shall be had until the name of the proposed clergyman shall be submitted to the bishop. Failure to comply with the latter provision makes the election absolutely void. There is no logic in the argument that the service of notice was not necessary in this case. The defendants claim that there was an understanding between the bishop and the rector which was to the effect that the rector might

be re-elected by a new vestry. This is entirely inconsistent with the facts as is shown by the attitude of the bishop towards the rector, by his actions in approving the report of the investigating committee, and by all of his conduct in connection with the transaction. There is another reason why the notice should be given.

Section 3 of canon 19 reads as follows: " If the Ecclesiastical Authority [meaning the bishop] be satisfied that the person so chosen is a duly qualified Minister, and that he has accepted the office, the notice [of election] shall be sent to the Secretary of the Convention who shall record it. And such record shall be sufficient evidence of the relation between the Minister and the Parish."

The defendants claim that the words " duly qualified minister " refer only to one who has been ordained. If this were the true construction, then it would not be necessary for the bishop to act. It would be necessary only to file the certificate of election with the secretary, who would have a record of the ordained ministers, and by reference to such record he could at once determine the due qualifications of the minister. The transmission of the notice to the bishop and by the bishop to the secretary would be a useless ministerial procedure. The words " duly qualified " mean more than " duly ordained." They imply *qualifications to preside over the worship and spiritual jurisdiction of the parish,* and the fact that the defendant Beaty was not " duly qualified " so to do is proved by the report of the investigating committee which stated that " irreconcilable factions had developed in the parish and that it would be for the best interests of all concerned that Beaty resign." This, in effect, meant that a lack of harmony prevailed in the parish and that it was hopeless to attempt, under the then existing conditions, to correct it; therefore, in so far as the parish was concerned, Beaty was not " duly qualified." The whole record shows that whether or not Beaty was remiss in his duties or chargeable with any fault whatsoever among his parishioners, nevertheless they so looked upon the situation, and, therefore, rightfully or wrongfully, he was the cause of the dissension.

" There are numerous reasons not affecting the religious or moral character of a pastor, such as the condition of his family, his own weaknesses, foibles, manners, eccentricities, infirmities of temper, or mere indiscretions, which might render his services ineffectual for good and possibly productive of evil in a congregation. In such case, the exigencies may be such that the very life and existence of the church depend upon his removal. Strife and bitterness may have become so far engendered that they are irreconcilable." *Connitt* v. *R. P. D. C. of N. Prospect,* 54 N. Y. 551, 559.

" A house divided against itself will fall." Beaty was not duly

qualified to administer to this particular parish. It must be held, therefore, that the bishop had it within his power to pass upon such qualifications and record or not record such election; hence the necessity of complying with the provisions of general canon 19, section 3, by securing the approval of the bishop to the election of a rector, and hence the provisions of diocesan canon 7 as an aid in securing a duly qualified minister.

It is my conclusion that there was a vacancy in the office of rector and that such vacancy was not legally filled.

In discussing the question of a vacancy and the legality of Beaty's election as rector, I have assumed that the wardens and vestrymen were legally elected and qualified to act. This is another question in dispute.

The plaintiff attacks the validity of the election held at the special meeting on May 31, 1921, on two grounds: (1) Women were permitted to vote. (It appears that approximately 100 of the 144 ballots were cast by women.) (2) A large number of the voters were not regular contributors to the support of the parish for a period of twelve months preceding such election.

The provision authorizing women to vote at an annual or special election is contained in diocesan canon 14 which permits women to vote at such meetings whenever such parish shall so determine in the manner provided in section 46 of the Religious Corporations Law. This section designates the proceedings to be taken in order to permit such privilege to be extended to women. Such provisions are as follows:

(1) The vestry must adopt a resolution recommending such action.

(2) Notice of such recommendation shall be included in the notice of the next *annual* election of such parish, and be submitted to the meeting.

(3) The recommendation shall be ratified at such meeting.

(4) The presiding officer and at least two qualified voters present at such meeting shall execute and *acknowledge* a certificate setting forth such resolution and the fact of the notice thereof having been given with the notice of such annual election and that the meeting had ratified the same.

(5) The certificate shall be filed in the office of the clerk of the county in which the original certificate of incorporation is filed.

The vestry passed the necessary resolution at a meeting held on September 19, 1919. As already stated, section 43 of the Religious Corporations Law requires " that *the notice of the special meeting shall specify the matter or question to be brought before such meeting and no matter or question not specified in such notice shall*

*be acted on at such meeting."* The requirements of the statute were not complied with. The recommendation of the vestry was ratified, not at an annual meeting, but at a special meeting held on November 30, 1919. Moreover, the notice of such special meeting did not specify that such action was to be taken. Action was required at the *annual* meeting, and if it can be said that action at the special meeting would suffice, it still remains as a fact that the statutory provisions as to the notice were not complied with in the notice of the meeting, or in the certificate filed. The recital therein of the fact that " *due and legal notice* " was given of the holding of said meeting cannot be considered as a statutory compliance. It is not a recital that " due and legal notice " was given of the matter or question to be brought before such meeting. The procedure to qualify women as voters was never followed; hence the voting at such special meeting of May 31, 1921, was illegal. The fact that from and after the date of the ratification of such recommendation women had voted at all annual and special meetings could not in any way legalize their voting at any later meeting. Voting illegally at special meetings, even without objection, cannot legalize the same act at a later meeting.

The statutory provisions stated are mandatory, not directory; hence there must be a strict compliance. *Wuesthoff* v. *Germania Life Ins. Co.,* 107 N. Y. 580.

As to failure to acknowledge the certificate of election which was executed and filed, I am not so positive. This acknowledgment was for the purpose of forming a complete certificate capable of being filed and offered in evidence as authentic proof of the facts therein contained; hence has no particular bearing on the validity of the election, but rather has its effect when an offer is made to use such certificate as proof of the facts therein contained.

The second ground of objection to the legality of such election is the disqualification of many of the voters who had not been regular attendants and contributors as required by the statute and the canons of the church.

Section 43 of the Religious Corporations Law stated that at any such meeting " said presiding officer shall be the judge of the qualifications of a voter."

Literally construed, this includes all voters, men or women, contributors or non-contributors. Surely the statute did not intend to authorize the rector to judge a woman qualified to vote when the statute said she was not. I prefer to construe the statute as applying to the qualifications of voters as based upon the claim of being regular contributors and attendants. In the latter case there could easily be a question of fact as to the requisite attendance

or contribution, and no one would be in any better position to determine that question than the rector. I, therefore, conclude that the voting of non-contributors without objection was legal because of such determination by the rector. I also conclude that the voting of women at such election was illegal, whether so voting with or without objection.

The question remains as to whether the validity of such election can be attacked in this action. Defendants claim that the bishop is not in a position to attack the election and that all others are estopped. The defendants cite *Parish of Bellport* v. *Tooker*, 29 Barb. 256, and *Concord Society* v. *Stanton*, 38 Hun, 1, as authority for the proposition that the legality of this election cannot be attacked collaterally. I do not regard the cases cited as authority for the proposition advanced, nor do I regard this action as a collateral attack. Defendants also cite *People* v. *Lacoste*, 37 N. Y. 192, to sustain the proposition that the election cannot be set aside. That case was a *quo warranto* proceeding. Opposing parties sought a judgment declaring them respectively elected to the offices of wardens and vestrymen. The court held: " The presumption is that he [the presiding officer] did his duty, and received only the votes of electors. The relators, in order to succeed in this action, must establish, by competent evidence, that, at the election, they, instead of the defendants, were duly elected. The burden is upon them. They must prove, not only that illegal votes were cast for the defendants, but also that if the illegal votes were deducted the defendants had not received a majority. In other words, it was incumbent on the relators to show that the defendants, who held the certificate of election and who were in possession of the office, received less than a majority of the votes of the duly qualified electors voting at the election."

Here, however, it cannot be presumed that the presiding officer did his duty after it has been shown that he did not. He allowed approximately 100 illegal votes of women. His action in allowing them to vote cannot be criticised as an intentionally illegal act, but such votes were nevertheless illegal. Certainly this should overcome the presumption and shift the burden of showing a legal election. It must be remembered in this connection that this is not a *quo warranto*. There is no offer to show that the ticket defeated on the election was legally elected. This is an action to declare defendants illegally elected, not to prove that the other parties are entitled to office. In so far as the action applies to the officers not elected at such special meeting, but appointed by those illegally elected thereat, their appointment or election

cannot be held more legal than the legality of the election of the original board who filled such vacancies.

The brief of the defendants sets forth five grounds each of which they claim is sufficient to defeat the plaintiff's action, as follows:

(1) That the right and title to an office in a religious corporation organized under the laws of this state cannot be tested or determined in an action of this character;

(2) That the possession, control and management of the property and temporal affairs of a Protestant Episcopal church incorporated under the laws of the state and laws of the church, is in the rector, wardens and vestrymen of the church, and so long as such property is not used for other than church purposes, no one outside of such officers has any right to interfere with or have any voice in such possession, management or control;

(3) That the plaintiff, not being a member of or personally interested in the religious corporation known as Grace Church of Cortland, N. Y., and not having, either by laws of the state or of the church, any direct control over or interest in the church or the temporalities of the church, cannot maintain such an action as this;

(4) That on the undisputed facts Davis is the duly elected and qualified treasurer of the corporation and Beaty is the duly elected and qualified rector and each of them entitled, under the law, to exercise all the privileges of their respective offices;

(5) That there had been no action taken on the part of the plaintiff or his predecessor, or by the church, or its authorities which authorizes an appeal by them to the civil courts in this matter, nor has there been anything done by the defendants which subjects them to any civil liability or direction. In other words, there is nothing in the evidence which gives this court jurisdiction of the parties or of the subject of the action.

The answer to the first defense is the fact that there is no remedy within the laws of the church. The ecclesiastical authorities are helpless under the facts here presented to recover possession and control of the church properties from those illegally in possession. The custody and control of those properties are held under the authority of the Religious Corporations Law, section 5, to " administer the same in accordance with the discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject."

No other kind of action could be maintained. In their brief the defendants state that they do not base their claim upon the theory that the plaintiff has no adequate remedy at law, but upon the theory " that the plaintiff has no remedy and no standing whatever in this action; that the court has no jurisdiction of the

subject matter and this by reason of the fact that there is no evidence of the violation of any decree, order, command, direction or request or of any misappropriation, misuse or waste of funds and that the plaintiff cannot be aggrieved by anything that has been done."

The defendants having taken this position, it becomes unnecessary to discuss the question as to whether the remedy is at law or at equity. There can be no question that the remedy here sought is equitable, and if the civil courts have jurisdiction of the subject-matter the rules of equity will apply.

The second and third defenses raise the question as to the authority of the bishop.

Reverting again to the provisions of section 5 of the Religious Corporations Law, we find that the property of the church must be administered according to the discipline, rules and usages of the governing body. It is the purpose of acquiring and maintaining church property. Such purposes are to be determined by the rules, discipline and usages of the particular denomination and parish, and for its best spiritual interests, and when the trustees of such corporation fail to use the property for the purposes for which it was acquired, they fail in the performance of their duties under the law of the state; hence some person or body has the right to interfere under the provisions of section 5 above quoted. The exercise of that right is vested in the governing body of the church, the authority which, in this case, is delegated to and vested in the bishop. He is, as claimed by the plaintiff, *ex officio* the rector in case of a vacancy. White, Church Law, 185.

There can be no possible question raised as to his authority to proceed against the rector as he is not an officer of the corporate body, and his authority is entirely subordinate to that of the bishop as the supreme ecclesiastical head of the diocese. *Rhinelander* v. *Ballentine,* 23 Penn. Dist. Rep. 1093.

" The defendant contends that there is no power in the common-law courts to compel obedience to the decision of the bishop of the diocese; that notwithstanding the command to allow the bishop's appointee to conduct services in St. James Church, Perkiomen, he, the defendant, can simply refuse to obey such command because under Canon 38 there is no penalty attached to such refusal nor any way of enforcing the bishop's order.

" If such be the law, a contumacious priest, after due hearing, trial and sentence, can calmly fold his arms and bid defiance to his superiors. And what would be the condition of the parish in the meantime? With the congregation divided, a lack of harmony amongst the members of the parish, a scandal and disgrace to the church   *   *   *.

" It would be a remarkable condition of affairs if there is no authority to carry out the decision of the bishop simply because no penalty can be inflicted.

" In the case we are considering the defendant is usurping the duties conferred on another. His relationship to the parish has been dissolved in a regular and orderly manner by the authority of his bishop, on whom is cast the duty in cases of differences between a priest and his vestry.

" There being no other way of enforcing obedience, it would seem to be a case where a court of equity should act in order to do that for which there is no proper church law to govern the case.

" *Bonacum* v. *Harrington* (91 N. W. Repr. 886. Same case 65 Nebr. 831) it was ruled that 'when the governing authority of a religious denomination has deprived one of its clergymen of his authority to officiate as such, he may be enjoined from making use of church property in that capacity, or under color of the functions of which he has been deprived. * * * *No other remedy is adequate or practicable in such a case.*' See, also, *Pounder* v. *Ashe*, 44 Nebr. 672; 63 N. W. 48; 34 Cyc. 1148. The principle thus stated guides us in our decision. We are of the opinion that where in cases like the present a manifest wrong is done by a contumacious priest in wilful and arbitrary disobedience to his ordination vow and the lawful command of his superior, equity will act.

" When ordained and asked the question ' Will you reverently obey your bishop and other chief ministers, who, according to the canons of the church, may have the charge and government over you, following with a glad mind and will their godly admonitions, and submitting yourself to their godly judgment? ' He answered, ' I will do so, the Lord being my helper.'

" Our decree is merely enforcing his solemn promise."

The authority of the bishop also extends to interference with the acts of the wardens and vestrymen because of the fact that they have not administered the property and temporalities of the church in accordance with the discipline, rules and usages of the ecclesiastical governing body. Not having done so, there is a remedy, and inasmuch as the church provides no penalty therefor, there must be a resort to the civil courts.

The trustees have failed to govern and administer the corporate property in a proper manner, by neglecting to elect a rector according to law. Their failure so to do is a failure to provide means for the conduct of religious services in connection with the property provided for such purpose. They have also failed to perform their duty by the engagement of an unlicensed lay reader, instead of an ordained minister. For several months, Mr. Stanley, a

MATTER OF SAMUEL KRAUS. **21**

Misc. 21]     Surrogate's Court, New York County, December, 1922.

communicant of the church, read such service, although not licensed so to do.   This is forbidden by general canon 25.   It is true that general canon 22 permits communicants to act as lay readers, but by the provisions of general canon 25 they must be licensed.

This, therefore, is another violation of the duties of the vestry, calling for the interference by the bishop.

The fourth defense has already been discussed, and the question raised on the fifth defense is not sustained by reason of the matters which have heretofore been discussed.

Civil courts will not revise the decisions of religious associations upon ecclesiastical matters merely to ascertain their jurisdiction, and the decisions of ecclesiastical courts are final as to what constitutes an offense against the discipline of the church, and when rights of property are dependent upon questions of doctrine, discipline or church government, the civil court will treat the determination made in the highest tribunal within the church as controlling. Where such tribunals have jurisdiction, civil courts cannot inquire whether they have proceeded according to the laws and usages of the church or whether they have decided correctly, but their decisions are final and binding upon the courts.   *Connitt* v. *R. P. D. C. of N. Prospect, supra; Rector St. James Church* v. *Huntington*, 82 Hun, 125, 133; *Baxter* v. *McDonnell*, 155 N. Y. 83, 101.

I, therefore, conclude that the plaintiff is authorized to institute this action and that this court has jurisdiction to entertain the same; that the defendants are holding their respective offices illegally, either by election or by appointment from those not duly elected, and that the injunctive relief demanded in the plaintiff's complaint should be granted.

Judgment is directed accordingly, with costs against the defendants.

Ordered accordingly.