**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAMES M. BELL,
Plaintiff-Appellant,

v.

PRESBYTERIAN CHURCH (U.S.A.);
BOARD OF CHURCH AND SOCIETY OF
THE UNITED METHODIST CHURCH;
WOMEN'S DIVISION OF THE GENERAL
BOARD OF GLOBAL MINISTRIES OF THE
UNITED METHODIST CHURCH;
AMERICAN BAPTIST CHURCHES IN THE                    No. 96-1297
U.S.A.,
Defendants-Appellees,

and

ELENORA GIDDINGS IVORY; JANE HULL
HARVEY; ANNA RHEE; JAY LINTNER;
ROBERT TILLER; LIONEL
DERENONCOURT; OTIS TURNER;
VERNON BROYLES,
Defendants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-95-1507-A)

Argued: April 10, 1997

Decided: October 1, 1997

Before HALL and NIEMEYER, Circuit Judges, and DUFFY,
United States District Judge for the District of South Carolina,
sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Hall and Judge Duffy joined.

_____

**COUNSEL**

**ARGUED:** James Wright Crabtree, SMATHERS & THOMPSON, Charlotte, North Carolina, for Appellant. Alissa Aaronson Horvitz, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Katharine B. Houlihan, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Appellees.

_____

**OPINION**

NIEMEYER, Circuit Judge:

The Reverend James M. Bell, an ordained minister, served as executive director of Interfaith Impact, a multi-denominational outreach program. In June 1995, his employment was terminated as part of Interfaith Impact's "complete reduction in force." Interfaith Impact's board of directors advised Bell that the termination was "based solely upon the financial condition" of the program and was "absolutely no reflection on the quality of your work." Bell sued Interfaith Impact's four principal constituent religious organizations, as well as others, for breach of contract and various torts arising from the termination. The district court dismissed the complaint against the constituent religious organizations because of a lack of subject matter jurisdiction, concluding that, by reason of the First Amendment, a civil court has no jurisdiction over ecclesiastical decisions by churches "as to how they are going to expend their funds." For the reasons that follow, we affirm the judgment of the district court.

I

More than twenty religious groups, including as principal contributors four national religious organizations,[1] created and funded Inter-

_____

[1] The four religious organizations, all named as defendants in this case, are the Presbyterian Church, U.S.A., the Board of Church and Society of

2

faith Impact, a nonprofit corporation in Washington, D.C., "to advance the jointly shared religious purposes of its members, namely, to carry out their theological imperative to increase the possibilities for peace, economic and social justice." Interfaith Impact's charter states as its mission:

> (1) promoting a public policy that reflects prophetic Jewish-Christian values, (2) advocating to the United States government the enactment of public policies that are just, promote peace and protect the environment (reflecting Jewish-Christian values), (3) developing and nurturing people of faith . . . to be effective advocates for public policies that are just, promote peace and protect the environment, (4) maximizing the voice, visibility, and ability of member agencies and denominations or faith groups to advocate for[such policies], (5) educating . . . the general public on the public policy issues of major concern to the inter-religious community.

In the fall of 1991, Interfaith Impact "called" Bell, an ordained minister, to serve as its executive director. In the engagement letter, Interfaith Impact recognized that Bell's service would be an extension of his ministry with the United Church of Christ, in which he was an ordained minister. It stated:

> We are happy that the four entities required by the United Church of Christ to recognize your ordained ministry in this position will do so. Those entities are you and your sense of call; the recognition of this being a place of ministry by your local church; the Potomac Association of the United Church of Christ; and Interfaith Impact for Justice and Peace.

The letter confirmed a financial arrangement that designated $25,000 of Bell's salary as "housing allowance" to enable him to claim a parsonage exemption from income taxes and a contribution that Inter-

_____

the United Methodist Church, the Women's Division of the General Board of Global Ministries of the United Methodist Church, and the American Baptist Churches in the U.S.A.

3

faith Impact would make to the United Church of Christ's pension program so that Bell would continue to receive pension and health benefits from that church. The letter concluded, "We hope this will be a rewarding ministry for you."

Because of diminished support from constituent faith groups in the spring of 1995, the full explanation for which does not appear in the record, Interfaith Impact began to experience serious financial difficulties. In May 1995, the Presbyterian Church, one of Interfaith Impact's main financial contributors, decided that because of the financial crisis it would not allocate further funds for Interfaith Impact for the year 1996. It also conditioned fulfillment of its 1995 commitment on a complete reduction of force and vacation of the premises rented by Interfaith Impact. The Presbyterian Church explained, "The current situation is not to be seen as the fault of the current staff who are in many ways victims of the circumstances the faith groups find themselves in due to diminished resources."

In response to the Presbyterian Church's withdrawal of support, the board of directors of Interfaith Impact promptly effected a complete reduction of force, intending to continue the program's ministry with a volunteer staff. In its letter of termination to Bell, dated June 23, 1995, the board stated:

> Your termination is based solely upon the financial condition of Interfaith IMPACT which has [led] the Board of Directors to enact a complete "reduction in force." In this termination, there is absolutely no reflection on the quality of your work.

The letter concluded, "I would again express to you my admiration and appreciation of your work, my regret for the situation that makes this reduction necessary, and my gratitude for the helpfulness which you are continuing to give to Interfaith IMPACT."

Several months later, Bell filed this action against the board of directors and against the four principal contributing religious organizations, challenging their expressed reason for ending the program and terminating his employment. He complained, in six counts, that the defendants (1) interfered with his contract, (2) intentionally

4

inflicted on him emotional distress, (3) breached a covenant of good faith and fair dealing, (4) interfered with his prospective advantage, (5) wrongfully terminated him, and (6) that the religious organization defendants breached their pledge to contribute to Interfaith Impact on a yearly basis. The district court dismissed the complaint against the individual board members for lack of personal jurisdiction and against the religious organizations because of a lack of subject matter jurisdiction.**2** He appeals only on the ground that the district court erred in determining that it lacked subject matter jurisdiction.

II

In keeping with the First Amendment's proscription against the "establishment of religion" or prohibiting the"free exercise thereof," civil courts have long taken care not to intermeddle in internal ecclesiastical disputes. As early as Watson v. Jones , 80 U.S. (13 Wall.) 679 (1871) (decided on general common law and not constitutional law), the Supreme Court disavowed the ability to resolve a dispute between a national religious organization and one of its local churches based on differing interpretations of church law, reasoning that

> All who unite themselves to . . . a [religious] body do so with an implied consent to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

Id. at 729. And later in Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1 (1929), the Court similarly refused, on constitutional grounds,

_____

**2** Bell thereafter sued the individuals, as well as Interfaith Impact, in the District of Columbia, where the district court entered summary judgment against him. See Bell v. Ivory, ___ F. Supp. ___, 1997 WL 329589 (D. D.C. June 11, 1997).

5

to force a Roman Catholic Archbishop to appoint the plaintiff to a chaplaincy which was denied to him based on an interpretation of Roman Catholic canon law. Justice Brandeis there formulated the rule that "[i]n the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." Id. at 16. These principles were applied more recently in Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952), where the Court refused, again on constitutional grounds, to intervene into a schism between the Russian Church in America and the Soviet-era Russian Orthodox Church over church lands, holding that churches must have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Id. at 116.

Although Gonzalez and other cases allowed the possibility of "`marginal civil court review' under the narrow rubrics of `fraud' or `collusion' when church tribunals act in bad faith for secular purposes," the Court in Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696 (1976), abandoned any"arbitrariness" exception, moving yet further from any role for civil courts in ecclesiastical disputes. Id. at 713. It has thus become established that the decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts. Rather, such courts must defer to the decisions of religious organizations"on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law." Id. The Supreme Court explained,"[I]t is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria." Id. at 714-15.

The question that we must resolve in the case before us, therefore, is whether the dispute between Bell and the four national churches is an ecclesiastical one about "discipline, faith, internal organization, or ecclesiastical rule, custom or law," id. at 713, or whether it is a case in which we should hold religious organizations liable in civil courts for "purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization." General Coun-

6

cil on Finance Administration of the United Methodist Church v. California Superior Court, 439 U.S. 1369, 1373 (1978) (Rehnquist, Circuit Justice). We conclude that the dispute in this case is ecclesiastical.

Bell's complaint against the four national churches centers on the Presbyterian Church's withholding of funding and its consultation with the other constituent churches in effecting a complete reduction of force of Interfaith Impact. Bell argues that the motives of these churches were not as benign as simply withdrawing financial support. He has alleged that board members were improperly focusing on taking over the Interfaith Impact ministry, or on his personal life, or on unjustified claims of financial misconduct. At bottom, however, Bell's challenge focuses on how the constituent churches spend their religious outreach funds. While it is possible that the Presbyterian Church may have harbored hostility against Bell personally, it is also possible that the church may have been acting in good faith to fulfill its discernment of the divine will for its ministry. Resolution of such an accusation would interpose the judiciary into the Presbyterian Church's decisions, as well as the decisions of the other constituent churches, relating to how and by whom they spread their message and specifically their decision to select their outreach ministry through the granting or withholding of funds.

Bell argues that he is not challenging the internal decisions of the national churches but their external conduct in interfering with his relationship with Interfaith Impact. He characterizes this as a secular dispute between the churches and a third party. This argument, however, overlooks Interfaith Impact's role as the joint ministry of its constituent churches and Bell's role as executive director of Interfaith Impact.

Interfaith Impact is not a secular organization with which the national constituent churches had a secular relationship. On the contrary, Interfaith Impact constituted a ministry of those constituent churches, and this was understood by all persons involved. The national churches maintain that they were engaging in ministry as directed by scripture, relying on Deuteronomy 15:11; Proverbs 21:3; Isaiah 49:6, 58:10; Amos 5:22-24; and Matthew 5:14-16, which they read to describe spreading light in the world and pursuing social jus-

7

tice as core Judeo-Christian values. Their claim is borne out by the charter of Interfaith Impact which provides that it is organized "to advance the jointly shared religious purposes of its members, namely, to carry out their theological imperative to increase the possibilities for peace, economic and social justice." Interfaith Impact's religious purpose is also borne out by Interfaith Impact's engagement of Bell in its "ministry." Indeed, their engagement letter to Bell concluded, "We hope this will be a rewarding ministry for you." Finally, Bell himself treated his position as a ministry. He obtained approval from his church to engage as executive director of Interfaith Impact as part of his ministry, and he agreed to the designation of part of his salary as a parsonage allowance for tax purposes. In summary, in carrying out his duties, Bell worked to spread the shared religious beliefs of Interfaith Impact's constituent members and to promote their Judeo-Christian values.

As this court has previously noted, a person is a member of a religion's clergy "if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164, 1169 (4th Cir. 1985); see also Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 337 (1987) (recognizing the importance to the religion's mission of activities run by closely-associated corporations); E.E.O.C. v. Catholic Univ., 83 F.3d 455, 461-63 (D.C. Cir. 1996) (citing Rayburn in case applying "ministerial exception" to a professor of canon law); Scharon v. St. Luke's Episcopal Presbyterian Hosp. , 929 F.2d 360, 362-63 (8th Cir. 1991) (finding a chaplain in a religiously-affiliated hospital to be a minister); E.E.O.C. v. Southwestern Baptist Theological Seminary, 651 F.2d 277, 283 (5th Cir. Unit A July 1981) (considering even non-ordained Baptist seminary faculty to be ministers for Title VII purposes). In light of this precedent, it follows that Bell too was serving in a religious ministry while acting as executive director of Interfaith Impact.

When the Presbyterian Church decided to withhold its funds from Interfaith Impact, causing the end of Bell's work at Interfaith Impact, the Presbyterian Church, as well as the other churches, made a decision on how it would expend funds raised by the church for religious

8

purposes, which directly related to its outreach ministry and Bell's status as a minister. Such a decision about the nature, extent, administration, and termination of a religious ministry falls within the ecclesiastical sphere that the First Amendment protects from civil court intervention.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

9