**Jane Holmes DIXON, Plaintiff,**

v.

**Samuel L. EDWARDS and The Vestry of St. John's Parish, Defendants.**

**No. PJM 01–1838.**

United States District Court,
D. Maryland.

Oct. 29, 2001.

As Amended Nov. 30, 2001.

704

Michael L. Martinez, Bridget E. Calhoun, McGuiness Norris and Williams LLP, David M. Schnorrenberg, Michael G. Van Arsdall, Crowell and Moring LLP PH, Washington, DC, for Plaintiff.

Charles H. Nalls, deKieffer and Horgan, Rufus W. Peckham, Jr., Law Office PH, Washington, DC, for Defendants.

## *OPINION*

MESSITTE, District Judge.

Plaintiff Jane Holmes Dixon is the Bishop *Pro Tempore* of the Washington Diocese of the Protestant Episcopal Church of the United States.[1] The geographic boundaries of the Diocese encompass the District of Columbia and the Maryland counties of Montgomery, Prince George's, Charles, and St. Mary's. Defendant Samuel L. Edwards is an ordained Episcopalian priest who claims entitlement to be Rector of St. John's Parish located in Accokeek, Prince George's County, Maryland.[2] Defendant Vestry of St. John's

[1] The Church, since 1967, has been known as the Episcopal Church. Frank S. Mead, *Handbook of Denominations in the United States* 129 (10th ed.1995).

[2] Bishop Dixon is a resident of Washington, D.C., Father Edwards a resident of Maryland. The case is before the Court pursuant to its diversity jurisdiction. 28 U.S.C. § 1332.

Parish is a Maryland religious corporation, responsible for guiding the affairs of St. John's Parish, including Christ Church.[3]

In this action, Bishop Dixon asks the Court to make the following declarations:

a) that she or her delegate has the right to be present in the buildings and on the grounds of St. John's Parish and to perform her duties as Bishop and Rector *Ex Officio* there; and that her actions on May 27, 2001 did not, and similar future actions by her or her delegate will not, constitute trespass (Count I);

b) that she has a right to preside at meetings of the Vestry of St. John's Parish and the Parish of St. John's (Count I);

c) that the purported contract between the Vestry of St. John's Parish and Father Edwards for him to serve as Rector of the Parish is invalid and without effect (Count II);

d) that the acts of the Vestry in contracting with Father Edwards to be and holding him out as Rector of St. John's Parish and preventing Bishop Dixon from presiding at Vestry meetings and performing other acts as Rector *Ex Officio* are *ultra vires* and of no force and effect (Count III);

e) that, under the Maryland Vestry Act, 1976 Md.Laws Ch. 96, § 312J, Father Edwards is not Rector of Christ Church (Count IV); and

f) that, under the Maryland Vestry Act, 1976 Md.Laws. Ch. 96, § 312G, Father Edwards is unlawfully using and occupying the buildings and property of St. John's Parish (Count V).

Accordingly, Bishop Dixon asks that the Court enjoin:

a) Defendants from taking any actions that would prevent her from perform-ing her duties at St. John's Parish, including, officiating at services and ministering to its congregation and presiding at the meetings of the Vestry and Parish of St. John's;

b) Father Edwards from officiating at religious services on or near the grounds of St. John's Parish;

c) Father Edwards from taking any actions as Rector of St. John's Parish including, but not limited to, presiding at meetings of the Vestry or officiating at services of St. John's Parish;

d) Father Edwards from using or occupying the building or grounds of St. John's Parish; and

e) grant such further relief as may be appropriate.

Bishop Dixon's Complaint was accompanied by a Motion for Preliminary Injunction. Defendants have filed a Motion to Dismiss the suit, and Bishop Dixon has filed a Motion asking for Summary Judgment.

Having considered the parties' submissions and oral arguments, the Court will DENY Defendants' Motion to Dismiss and GRANT Bishop Dixon's Motion for Summary Judgment.[4]

I.

The Episcopal Church of the United States is a body of believers holding to a substantially similar creed and organized according to a structure which they believe is the true succession to the ministry of Jesus Christ. The Church is governed on the national level by a General Convention composed of a House of Bishops and a House of Deputies. The House of Bishops is composed of bishops of the Episcopal Church. The House of Deputies is composed of four clergy and four laity selected

---

**3.** The Vestry may sue or be sued in its own name.

**4.** Accordingly, Bishop Dixon's Motion for Preliminary Injunction is MOOT.

from each of the geographical dioceses of the Church. There are one hundred geographical dioceses in the United States, each presided over by a bishop, who is the ecclesiastical authority in the diocese. Each diocese is composed of congregations, generally known as "parishes" or "missions," located in its geographic area. The Church is governed by a National Constitution and Canons. It is also governed by the Book of Common Prayer and its rubrics (*i.e.,* ecclesiastical rules) as adopted by the General Convention in 1979. Under Article X of the National Constitution, the Book of Common Prayer must be used in all the dioceses of the Church. The preamble to the Constitution speaks of the mission of the Church in terms of "upholding and propagating the historic Faith and Order set forth in the Book of Common Prayer." In each diocese, the bishop may be assisted by a bishop suffragan, *i.e.,* an assistant bishop. As provided in the Constitution, in the absence of a diocesan bishop, the constitution and canons of a diocese may provide that a bishop suffragan of the diocese will be placed in charge of the diocese and become the ecclesiastical authority therein until such time as a new diocesan bishop is chosen and consecrated.

Each diocese has a representative governing body, generally termed the Diocesan Convention, composed of clergy of the diocese and lay representatives elected from each congregation within the diocese. Each parish is governed by a group of elected representatives called a "vestry." Parishes in the diocese typically have by-laws setting forth procedures for the governance of the parish. Parish by-laws, however, may not be inconsistent with the Constitution and Canons of the Church or of the diocese in which the parish is located. Each parish of the Church is headed by a rector who shares spiritual jurisdiction of the parish with the bishop. In the absence of a rector, the bishop acts as rector *ex officio.* As will be discussed more fully, *infra,* the rector of a parish is chosen by the parish or its vestry, with the consent of the ecclesiastical authority of the diocese, namely the bishop.

The Diocese of Washington of the Protestant Episcopal Church in the United States was formed and incorporated by Act of the United States Congress in 1896, encompassing the District of Columbia and the Maryland counties of Montgomery, Prince George's, Charles, and St. Mary's. The Canons of the Diocese provide for a suffragan bishop who becomes the ecclesiastical authority of the diocese in the absence of an elected bishop. The Canons of the Diocese also state that "if the Parish is without a rector, the Bishop shall preside [at vestry meetings], if present."

On November 19, 1992, Jane Holmes Dixon was elected and consecrated as Suffragan Bishop of the Diocese of Washington. Effective January 1, 2001, with the retirement of the Right Reverend Ronald Haines, she became Bishop of the Diocese of Washington *Pro Tempore* and the Ecclesiastical Authority for the Diocese.

As she describes her office, Bishop Dixon serves as the apostle, chief priest, pastor, and ecclesiastical authority in the Diocese of Washington. Consistent with the vows that she took upon her ordination as Bishop, she takes as her mission the guarding of the faith, unity, and discipline of the Church and the upholding of the doctrine, discipline, and worship of the Church within the Diocese of Washington. This includes celebrating the Eucharist,[5]

---

**5.** The Eucharist is defined as the "sacrament of the Holy Communion," *see Webster's Unabridged Dictionary* 667 (2d ed.1998), in turn defined as "[t]he Christian sacrament in which consecrated bread and wine are partaken of in celebration of Christ's Last Sup-

preaching the Word, and baptizing and confirming in the parishes within the Diocese. She accomplishes this through visitation to these parishes and by sharing her ministry with the priests throughout the diocese. Ultimately she is the one who determines who in the Diocese may be ordained as clergy. Bishop Dixon serves as rector *ex officio* in congregations that are without a rector. She has a pastoral responsibility for the clergy and laity of the Diocese of Washington.

St. John's Parish, located in Accokeek, Prince George's County, Maryland, is a parish within the Diocese of Washington and the Episcopal Church. Its by-laws for the conduct of business were adopted pursuant to the Canons of the National Convention and the Diocese of Washington and the Maryland Vestry Act, 1976 Md. Laws Ch. 96, §§ 312A–312Q.

For approximately two years prior to December 2000, St. John's Parish was without a rector. Then, by letter dated December 13, 2000, the Vestry of St. John's advised the Right Reverend Haines, at the time still Bishop of the Diocese of Washington, that the Vestry was planning to elect Father Samuel L. Edwards, a canonical resident of the Episcopal Diocese of Fort Worth, Texas, as its next rector. On December 31, 2000, Bishop Haines retired as the Bishop of the Diocese of Washington, succeeded by Bishop Dixon as Bishop *Pro Tempore.*

In her new capacity, Bishop Dixon undertook to determine whether Father Edwards was qualified to be a rector.[6] Indeed, it appears that even before she officially became Bishop *Pro Tempore*, on the same day that the Senior Warden of Christ Church informed Bishop Haines of the Vestry's plan to elect Father Edwards, Bishop Dixon communicated with the Senior Warden by telephone relative to Father Edwards. In that conversation, the Bishop advised the Senior Warden that Father Edwards could not be approved until after a satisfactory standard background check had been completed, a discussion had been held with Bishop Jack Leo Iker, Bishop of the Diocese of Forth Worth, where Father Edwards was canonically resident, and a meeting had taken place between the Bishop of the Diocese of Washington and Father Edwards.

The meeting between Father Edwards and Bishop Dixon (who, as indicated, had become Bishop *Pro Tempore* as of January

---

per." *American Heritage Dictionary* 299 (2d ed.1985).

**6.** The relevant canon of the Episcopal Church governing clergy call is Title III, Canon 17, which provides:

Of the Calling of a Rector

Sec. 1. When a Parish is without a Rector, the Wardens or other proper officers shall promptly notify the Bishop. If the authorities of the Parish shall for thirty days have failed to make provision for services of public worship, it shall be the duty of the Bishop to take such measures as may be deemed expedient for the temporary conduct of public worship.

Sec. 2. No election of a Rector shall be held until the name of the Priest whom it is proposed to elect has been made known to the Bishop, if there be one, and sufficient time, not exceeding thirty days, has been given to the Bishop to communicate with the Vestry thereon, nor until such communication, if made within that period has been considered by the Parish or Vestry at a meeting duly called and held for that purpose.

Sec. 3. Written notice of the election, signed by the Wardens, shall be sent to the Ecclesiastical Authority of the Diocese. If the Ecclesiastical Authority be satisfied that the person so chosen is a duly qualified Priest and that the Priest has accepted the office, the notice shall be sent to the Secretary of the Convention, who shall record it. The record shall be sufficient evidence of the relation between the Priest and the Parish.

1, 2001) was scheduled for January 10, 2001 – 28 days after the Vestry's December 13, 2000 notice of his proposed election. That meeting, however, at Father Edwards' request, did not take place. Specifically, on January 3, 2001, he sent an electronic mail message to Bishop Dixon's administrative assistant requesting that the January 10 meeting be rescheduled for a date more than thirty days beyond the date of the Vestry's notice of his proposed election. At that time, the Bishop's assistant told Father Edwards that "prior to the Bishop's issuing of the call [of Father Edwards to the rectorship] and the negotiation of a contract, she must have access to all your paperwork, including a background check, and she must meet with you in person. That is why setting this appointment up is so important to this process." On January 9, 2001, the Bishop's assistant advised the Senior Warden of Christ Church that the appointment with Father Edwards set up for January 10 had been canceled at Father Edwards' request. The meeting with Father Edwards was eventually rescheduled for February 26, 2001, and in fact took place on that date.

Shortly after the February 26, 2001 meeting, on March 6, Bishop Dixon advised Father Edwards that she declined to license him as rector of St. John's, having determined that he was not duly qualified to serve as such within the meaning of the Church Canons. By letter dated March 8, Bishop Dixon also notified the Vestry of St. John's that she would not approve Father Edwards, and detailed her reasons for rejecting him. Among the reasons she cited were remarks reportedly made or written by Father Edwards to the effect that the Episcopal Church has "become the unchurch"; that its leaders promote a view "derived from the kingdom of sin and death"; that the Church practices "institutionalized lawlessness"; that the "machinery" of the Church is "hell-bound"; that Father Edwards was teaching the importance of "gumming up the works of the Church"; that he was encouraging dioceses, congregations, and clergy to prepare "to sever their connection" with the Church; that his obedience to Bishop Dixon, as a woman bishop, would be limited; that he would resist any attempt by her to install him as rector of Christ Church even if she instructed him that he had to be installed by her; that he would not guarantee that he would obey her instructions regarding her visitation to Christ Church; that he would not guarantee that he would obtain her permission before inviting another bishop to Christ Church; and that he would not guarantee her that he would not attempt to lead Christ Church out of the Church or attempt to take Church property as part of that effort.[7]

Despite the communication of Bishop Dixon's decision to Father Edwards on March 6 and to the Vestry on March 8, Father Edwards moved from Texas to Accokeek, and on March 25 began officiating at services at St. John's.[8] Bishop Dixon concedes that whether or not Father Edwards was deemed to be rector of St. John's he could, under Church Canons, lawfully officiate at its services, because any priest may officiate in a diocese for two months without a license from the ecclesiastical authority of the diocese.

Within that two-month window, however, specifically on March 28, 2001, Bishop Dixon attended a meeting of the Vestry of St. John's and stated her intention to preside over the meeting pursuant to the Diocesan Canon which provides that "if the Parish is without a rector, the Bishop shall

---

7. Father Edwards takes issue with several but not all of these allegations.

8. Father Edwards and the Vestry of St. John's had signed a contract engaging him as Rector on February 6, 2001.

preside if present."[9] The Vestry and Father Edwards denied her the right to preside and Father Edwards presided instead.

On May 25, 2001, his two-month "license" having expired, Father Edwards was ostensibly required to cease officiating at St. John's. That did not happen. On Sunday, May 27, two days later, Bishop Dixon attempted to conduct a visitation to St. John's to celebrate the Eucharist at Christ Church. When she sought to enter the Church, she was told by the Vestrymen that while she could enter to worship, she could not celebrate the Mass. She, therefore, together with approximately forty parishioners of St. John's, celebrated the Mass under a pavilion on the grounds of Christ Church. While she was on the grounds of the Parish, certain individuals, apparently including some regular parishioners, attempted to interfere with her service by singing loud hymns. Others threatened to have her arrested for trespassing.[10]

During the May 27 alternate service, Bishop Dixon announced that Bishop Haines would act as priest-in-charge of St. John's until such time as a new rector could be found. Since that time, Bishop Haines and other priests as her delegates have been conducting services at a community center near Christ Church in Accokeek for those parishioners of St. John's who do not wish to receive the sacraments from Father Edwards. Father Edwards continues to occupy the rectory of St. John's Parish and to hold himself out as its Rector, all the while officiating at services at Christ Church.

On June 25, 2001, Bishop Dixon filed the present action. The parties' motions and oral argument to the Court followed soon after.

Insofar as possible, the Court considers Defendants' Motion to Dismiss first, then Bishop Dixon's Motion for Summary Judgment. As will be seen, however, the parties' arguments with respect to both motions overlap to such an extent that major aspects of the motions will be considered simultaneously.

## II.

Defendants ask the Court to dismiss the suit on the following grounds:

1) Bishop Dixon lacks standing to bring the suit.

2) The Episcopal Diocese of Washington is an indispensable party to the proceedings, whose absence mandates dismissal under Fed.R.Civ.P. 19(a).

3) The Court lacks subject matter jurisdiction over the action under Fed. R.Civ.P. 12(b)(1).

4) Bishop Dixon has failed to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6).

■ A motion to dismiss accepts the allegations of a complaint as true and puts forth grounds why, notwithstanding those allegations, the claim or claims of a suit should not go forward. Fed.R.Civ.P. 12(b). One of these grounds is that the court lacks jurisdiction over the subject matter of the complaint. Fed.R.Civ.P. 12(b)(1). A second is that the allegations of the claim, taken as true, fail to state a

---

9. To similar effect, a by-law of St. John's provides that "[if] the rectorship is vacant, the Bishop, if present, shall preside."

10. In July 2001 an ex parte peace order was sought against Bishop Dixon's husband by the Junior Warden of St. John's, who alleged that

he had been assaulted by Mr. Dixon. The charges were later dropped, but not before the church member told the judicial officer that the Vestrymen were contemplating trespass charges in the event of further efforts of Bishop Dixon and her husband to come on to Church property.

claim. Fed.R.Civ.P. 12(b)(6). To the extent that any factual determinations need to be made relative to the court's jurisdiction, the court is the finder of those facts. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). The Rule 12(b)(6) motion, on the other hand, requires no resolution of potential factual differences, and the allegations are assumed to be true.

A motion for summary judgment is appropriate if the court determines that no genuine issue of material fact is in dispute. Fed.R.Civ.P. 56. In passing upon the motion, the court considers matters of record, including affidavits, depositions and other documents. Fed.R.Civ.P. 56(c), (e). Disputes of fact must relate to *material* facts; that is, facts that are directly germane to the legal issues involved. *JKC Holding Co. v. Wash–Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir.2001). Differences as to immaterial facts will be disregarded for purposes of ruling on the motion. *Id.*

## III.

### A) *Standing*

 Standing to sue is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the Federal Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The particular inquiry is "whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The doctrine is comprised of both constitutional requirements and "prudential principles." *Gladstone Realtors v. Village of Bellwood*, 441

U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). One of the constitutional requirements is that the plaintiff has suffered an injury in fact, one which is concrete and not conjectural. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. One of the "prudential" principles developed by federal courts is that the claim must be for an injury to plaintiff's own legal rights and interests, as opposed to the legal rights or interests of third parties. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).[11]

Defendants argue that Bishop Dixon has failed "to show that [she] personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the Defendants" within the meaning of the *Valley Forge Christian College* case. Defendants contend that all of Bishop Dixon's claims flow from her role as Ecclesiastical Authority of the Diocese of Washington—in essence as the Diocese's representative—and do not affect any right she might possess as an individual. Thus, they argue, she claims to be entitled to enter upon parish property to perform her pastoral functions, saying that because the parish holds property and trust for the Diocese, she is entitled to enter upon it to perform her episcopal functions. Defendants contend that only by happenstance is Jane Holmes Dixon the Ecclesiastical Authority of the Diocese. Her Complaint, if proven, at most establishes that the Diocese has been injured by the actions of Defendants, not Jane Holmes Dixon personally.

---

**11.** As to this prudential principle,

> [b]ecause the rule is not constitutionally required, and because it is concerned with the arguments a litigant can make rather than with his right to be in court at all, the Supreme Court has now followed the

lead of commentators in referring to this rule as one of "jus tertii" rather than of standing.

Charles Alan Wright, *Law of Federal Courts* § 13 (citing, *inter alia, Secy. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984)).

■ Bishop Dixon prevails easily on this point. Her Complaint alleges that Defendants have deprived her of her personal right to perform her duties as the duly appointed Bishop of the Diocese of Washington and as Rector *Ex Officio* of St. John's, and of her personal right to preside at its vestry and parish meetings. She has further alleged that her personal right to enter upon the premises and officiate its services and minister to the congregation has been impinged upon, that she was personally denied access to the church and that she was personally threatened with arrest and a suit in trespass. All these facts are essentially conceded by Defendants. Their contention, therefore, that the Bishop has not suffered injury, that at most the Diocese has been injured, is simply without force. An individual is liable for trespass even if acting in a corporate capacity. *See Fletcher v. Havre De Grace Fireworks Co.,* 229 Md. 196, 200–01, 177 A.2d 908, 910 (1962).

Bishop Dixon has also laid claim to the offices of Rector *Ex Officio* and President of the Vestry, and to the right to preside at parish meetings, positions Father Edwards is now attempting to hold against her purported right. She has a personal stake in enforcing her entitlement to these offices, a proposition whose authority is no less than *Marbury v. Madison,* 5 U.S. (1 Cranch), 137, 161, 163, 2 L.Ed. 60 (1803) (involving suit by prospective government appointee to compel delivery of commission of appointment to office); *see also Sims v. Greene,* 160 F.2d 512 (3rd Cir. 1947) (allowing suit by bishop in his individual capacity concerning right to preside in church). •

Bishop Dixon has sufficiently alleged the individualized and particularized harm required for standing purposes.

B) *Washington Diocese as Necessary and Indispensable Party*

Defendants fold into their argument that Bishop Dixon lacks standing the further argument that she has failed to join the Washington Diocese, a necessary and indispensable party under Federal Rule of Civil Procedure Rule 19. The issue of non-joinder, to be sure, is distinct from the issue of standing, because a party can have standing to sue and still be at risk of dismissal for non-joinder of an indispensable party. That said, the Court considers Defendants' suggestion that the Court should dismiss this case for Bishop Dixon's failure to join the Diocese.

Rule 19(a) provides in pertinent part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impede or impair the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a).

Defendants argue that unless the Diocese is made a party to the litigation, complete relief cannot be accorded because the case requires the Court to make determinations regarding ownership of the parish property as to which Bishop Dixon personally has no claim. Defendants further claim that they face a substantial possibility that they could be subject to conflicting obligations because, were they

to prevail in this litigation, the Diocese could still institute a lawsuit against them with respect to the property issues raised in this suit. The point of this argument, the Court notes, is that joinder of the Diocese, whose presence extends to Maryland, would destroy the Court's diversity jurisdiction.

 Bishop Dixon also prevails easily as to this argument. As she points out, Rule 19 sets forth a two step inquiry:

> [C]ourts must first ask whether a party is necessary to a proceeding because of its relationship to the matter under consideration pursuant to Rule 19(a). If a party is necessary, it will be ordered into the action. When a party cannot be joined because its joinder destroys diversity, the court must determine whether the proceeding can continue in its absence, or whether it is indispensable pursuant to Rule 19(b) and the action must be dismissed.

*Owens–Illinois, Inc. v. Meade,* 186 F.3d 435, 440 (4th Cir.1999) (citations and internal quotations omitted). Moreover, Rule 19(b) states that a court must determine whether "in equity and good conscience" an action should proceed in the absence of a "necessary" party. Fed.R.Civ.P. 19(b). Such decisions are not to be lightly made. As the Court of Appeals for the Fourth Circuit stated in *Owens–Illinois, Inc. v. Meade,* 186 F.3d at 441, "courts are loathe to dismiss based on non-joinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result."

In the present case, there is no problem whatsoever of complete relief not being entered. Rule 19 refers to the inability of the court to accord complete relief "among those already parties, not as between a party and the absent person whose joinder is sought." *See Heinrich v. Goodyear Tire & Rubber Co.,* 532 F.Supp. 1348, 1359 (D.Md.1982) (quoting 3A James W. Moore et al., *Moore's Federal Practice,* § 19.07–1(1) (2d ed.1979)). Whether or not the Diocese is present in the case would not affect any relief that could be granted to Bishop Dixon in these proceedings.

Bishop Dixon disavows that the case requires any determination regarding ownership of parish property, the premise of Defendants' argument that they may be subject to incomplete relief.[12] The Court is in full agreement with Bishop Dixon's view. As the Court has already suggested in the standing context, the case turns on Dixon's right of access to the property; that is, whether she, as opposed to Father Edwards, is in charge at St. John's, not ownership of parish property, as Defendants argue.

Nor do Defendants face a substantial possibility of conflicting judgments. As Bishop Dixon points out, the Court can easily tailor the provisions of any judgment to avoid potential conflict with issues relating to the ownership of property. Beyond that, Bishop Dixon has adduced an affidavit from the President of the Standing Committee of the Diocese of Washington, which serves as the Council of Advice for the Bishop of the Diocese and which, in her absence, is the Ecclesiastical Authority

12. In fact, Defendants appear to argue inconsistently on this point. In their Memorandum Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss, for example, they say "[t]his matter is not, on its face, a church property case. . . . When rights of property are involved, the courts, of necessity, must proceed to consider and adjudicate those rights. . . . As long as the court does not have to resolve the doctrinal propriety of these changes [sic] in order to determine who has the legal control of the property, there is no unconstitutional intervention by the state in church affairs."

of the Diocese. That official, the Reverend David Thomas Andrews, specifically declares that the Standing Committee supports Bishop Dixon's decision to bring this lawsuit individually and in her own capacity, that the Diocese has declined to enjoin her as a plaintiff, and that the Committee believes that Bishop Dixon will adequately represent the Diocese's interests in these matters. To similar effect is an affidavit from the Moderator of the Diocesan Council of the Diocese of Washington, which serves as the Board of Directors of the Convention of the Episcopal Church of the Diocese of Washington for business purposes when the General Convention is not in session. He affirms that the Council has also determined not to join Bishop Dixon as a plaintiff in the suit, but feels that she can proceed in her own right and at the same time adequately represent the Diocese's interests.

■ Where it has been determined that an understanding exists between the absent party and a plaintiff that responsibility for litigating a particular matter rests with the plaintiff alone, courts have consistently concluded that the absent parties' interests are being effectively protected and have therefore held that the absent parties are not necessary parties. *See Coastal v. Laminators, Inc.,* 635 F.2d 1102, 1103 n. 3 (4th Cir.1980); *see also Washington v. Daley,* 173 F.3d 1158, 1167 (9th Cir.1999). That is precisely the case here. Defendants have failed to demonstrate that the Washington Diocese is a necessary and indispensable party under Fed.R.Civ.P. 19.

C) *Subject Matter Jurisdiction/Failure to State a Claim*

Defendants' core argument with regard to subject matter jurisdiction (as well as Bishop Dixon's alleged failure to state a claim) is that the facts pleaded in the Complaint comprise a matter subject to the internal rules and discipline of the Episcopal Church not subject to review by a civil court. In particular, say Defendants, pending disciplinary proceedings within the Church as well as its Canons preclude this action. Indeed, they say, Bishop Dixon herself initiated disciplinary proceedings against Father Edwards prior to the commencement of this suit which deprive the Court of jurisdiction. Finally, say Defendants, the Bishop failed to exercise her ecclesiastical remedies with respect to entry upon the property of the St. John's Parish.

Bishop Dixon contends that her case presents a justiciable controversy under the First Amendment to the United States Constitution. The Court agrees.

■ In *Watson v. Jones,* 80 U.S. (13 Wall.), 679, 20 L.Ed. 666 (1871), the United States Supreme Court articulated the standard of deference that civil courts must pay the decisions of ecclesiastical authorities:

> In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.*

This standard has been reaffirmed many times since 1871. *See, e.g.,Md. and Va. Churches v. Sharpsburg Church,* 396 U.S. 367, 369, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (In a concurrence, Justice Brennan made clear that "[c]ivil courts do not inquire whether the relevant [hierarchical]

church governing body has the power under religious law" to decide such disputes. He went on to specify that "such a determination ... frequently necessitates the interpretation of ambiguous religious law and usage," and that "[t]o permit civil courts to probe deeply enough into the allocation of power within [a hierarchical] church so as to decide ... religious law (governing church polity) ... would violate the First Amendment in much the same manner in civil determination of religious doctrine"); *The Serbian E. Orthodox Diocese for the United States & Canada v. Milivojevich,* 426 U.S. 696, 709, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) ("For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them."); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church of N. Amer.,* 344 U.S. 94, 122, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (Frankfurter, J. concurring) ("[w]hen courts are called upon to adjudicate disputes which, though generated by conflicts of faith, may fairly be isolated as controversies over property and therefore within judicial competence, the authority of the courts is in strict subordination of the ecclesiastical law of a particular church prior to a schism.")

■ This principle of deference to ecclesiastical decisions has been specifically applied in instances where the authority of an individual to hold a religious office is in dispute. In *Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), for example, the Court was asked to consider the decision of the Archbishop of the Roman Catholic Archdiocese of Manila that Gonzalez was not qualified to be appointed to a chaplaincy. Applying the *Watson* standard, the Court found that the Archbishop was the highest ecclesiastical authority in the Church and deferred to his decision regarding Gonzalez's qualifications. Said the Court, "[b]ecause the appointment is a canonical act, it is the function of church authorities to determine what the essential qualifications of a chaplain are and whether the candidates possess them." *Id.* at 16, 50 S.Ct. 5.[13]

Indeed, the deference due to ecclesiastical decisions has become far greater since *Gonzalez,* which held that "(i)n the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters of purely ecclesiastical ... are accepted in litigation before the secular courts as conclusive." *Id.* In *Milivojevich,* a case in which the Holy Assembly of Bishops and the Holy Synod of the Serbian Orthodox Church had suspended and removed Milivojevich as Bishop of the American–Canadian Diocese of the Church, the Court expressly removed the exception for "arbitrariness" articulated in *Gonzalez:*

---

**13.** On the other hand, it is clear that the Court has authority to adjudicate a conflict when the issue is whether church officials have the authority to implement a pastor's discharge as distinct from whether the church's decision to discharge him was correct. *See, e.g., United Methodist Church, Baltimore Annual Conference v. White,* 571 A.2d 790, 793 (D.C.1990); *Protestant Episcopal Church v. Graves,* 161 N.J.Super. 230, 391 A.2d 563 (1978) (enjoining Episcopal priest from occupation of a parish in derogation of the decision of the diocesan ecclesiastical authority); *cf. Guthrie v. Central Baptist Church,* 189 Md. 692, 694–95, 698, 57 A.2d 310, 311–13 (1948) (finding "jurisdiction to enforce property and contract rights of a religious corporation" where complaint alleged that pastor had been discharged but "persisted thereafter in attending and conducting services of the Church").

[N]o "arbitrariness" exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.

426 U.S. at 713, 96 S.Ct. 2372. The Court stressed the perils of holding otherwise:

> For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question.

*Id.* "This is exactly the inquiry that the First Amendment prohibits," the Court said, because

> recognition of such an [arbitrariness] exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.

*Id.;* accord, *Bell v. Presbyterian Church (U.S.A.),* 126 F.3d 328, 331 (4th Cir.1997). The *Bell* decision quotes *Milivojevich,* 426 U.S. at 713, 96 S.Ct. 2372, as providing that

> decisions of religious entities about the appointment and removal of ministers

and persons in other positions of similar theological significance are beyond the ken of civil courts. Rather, such courts must defer to the decisions of religious organizations "on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law."

126 F.3d at 331.

■■■ The initial inquiry, then, is whether the Episcopal Church is hierarchical in structure such that decisions of higher authorities in the Church having binding effect on lower authorities. The Court finds that it is. Despite an excursus by their canon law experts sharply at odds with major historical currents,[14] Defendants cannot seriously contend otherwise. Courts have repeatedly and invariably recognized that the Church is hierarchical. Indeed, there appears to be no case to the contrary and Defendants have noted none. *See, e.g., Parish of the Advent v. Protestant & Episcopal Diocese of Mass.,* 426 Mass. 268, 281–82, 688 N.E.2d 923, 931–32 (1997) ("We conclude that the Protestant Episcopal Church is hierarchical. The Constitution and Canons of [the Church] detail the authority exercised through a diocese to each local parish . . . the United States Supreme Court and the highest courts in other States have reached the same view . . . to our knowledge, there are no judicial holdings to the contrary.") *Bennison v. Sharp,* 121 Mich.App. 705, 720, 329 N.W.2d 466, 473 (1982) (holding that the Episcopal Church is "hierarchically structured as a matter of law"); *Protestant Episcopal Church in the Diocese of N.J. v. Graves,* 161 N.J.Super. 230, 253, 391 A.2d 563, 575 (1978) (same).[15] Mary-

---

**14.** Defendants' experts submit *inter alia* that, absent a figurehead comparable to the Pope of the Roman Catholic Church, the Episcopal Church cannot be considered hierarchical.

**15.** *Accord Watson,* 80 U.S. (13 Wall.) at 729; *Bishop & Diocese of Colo. v. Mote,* 716 P.2d

85 (Colo.1986); *Rector, Wardens & Vestrymen of Trinity–St. Michael's Parish, Inc. v. Episcopal Church in Diocese of Conn.,* 224 Conn. 797, 807–08, 620 A.2d 1280, 1285–86 (1993); *Tea v. Protestant Episcopal Church in Diocese of Nev.,* 96 Nev. 399, 610 P.2d 182 (1980); *Diocese of Newark v. Burns,* 83 N.J. 594, 598,

land law also acknowledges to hierarchical nature of the Church. Parishes in the diocese of Washington are governed by the Maryland Vestry Act, "relating generally to the organization, administration and control of the Protestant Episcopal Church and the Diocese of Washington." 1969 Md.Laws Ch. 533; *see also* 1951 Laws of Md. Ch. 462 ("[A]s to the ecclesiastical matters the said Episcopal churches and the several dioceses are governed by the canons of their diocese and of the Protestant Episcopal Church of the United States of America, but with respect solely to secular matters, the vestries of all said churches within the State of Maryland as corporate bodies are subject to the laws of the State.").[16]

In the *Milivojevich* case cited *supra*, 426 U.S. at 715–16 n. 9, 96 S.Ct. 2372, the Supreme Court articulated the criteria that establish a church as hierarchical:

1) The corporations in question are organized under the state religious corporations act governing the incorporation of religious societies that are subordinate parts of larger church organizations.

2) Resolutions of the subordinate entity acknowledge the superiority of the superior entity.

3) By-laws of the lower authority have been submitted to the higher for approval;

4) The priest takes an oath to be obedient to the higher authority;

5) Provisions in the constitutions and by-laws of both the superior and subordinate levels suggest a hierarchical relationship.

Applying those criteria to the present case: The Washington Diocese is organized pursuant to a law of Congress and the Vestry of St. John's according to the Maryland Vestry Act. The Maryland Vestry Act, under which the Vestry is incorporated, makes clear that the Vestry is subject to the provisions of the Canon law of the Protestant Episcopal Church.[17] Numerous acts of the Parish manifest its subordinate status to the Diocese, not least of which is its concession that the Bishop has authority (even if arguably limited in time) to consent to the election of the Parish's rector. The by-laws of the Parish make clear that they are subject to and may not be inconsistent with the Constitution and Canons of the greater Church. Father Edwards took an oath to be obedient to the Church, the Diocese, and the Bishop. And, finally, the hierarchical relationship of various levels is confirmed by the National Constitution, the Canons of the Church, the General Convention, and the Constitution and Canons of the Diocese.

---

417 A.2d 31, 33–34 (1980); *Trustees of the Diocese of Albany v. Trinity Episcopal Church of Gloversville*, 250 A.D.2d 282, 283 n. 2, 684 N.Y.S.2d 76, 78 n. 2 (1999); *Olston v. Hallock*, 55 Wis.2d 687, 201 N.W.2d 35 (1972).

**16.** *See also Presbytery of Baltimore of the United Presbyterian Church v. Babcock Memorial Presbyterian Church*, 52 Md.App. 428, 433, 449 A.2d 1190, 1193 (1982) At least two distinct types of hierarchical polity may be discerned, however. Under the Episcopal form of polity, all authority reposes in certain ecclesiastical officers.... Among the principal denominations with an Episcopal form of polity [is] the Protestant Episcopal Church....").

**17.** In citing Section 312J of the Vestry Act in support of the proposition that the Vestry is authorized to act independently of the Diocese with respect to choosing a rector, Defendants fail to cite critical language at the end of the statute:

Provided, however, that no action shall be taken hereunder contrary to provisions, consonant with public law, of the constitution and canons of the Protestant Episcopal Church or of the Diocese of said church wherein the parish is located.

1976 Md.Laws Ch. 96, § 312J.

In sum, each and every characteristic mentioned by the Supreme Court in *Milivojevich* as establishing the hierarchical nature of a church is indisputably present here. To the extent that Defendants' canon law experts speculate to the contrary, their speculations are, at best, legally immaterial.

■■■ The final issue, therefore, is whether the bishop represents the highest ecclesiastical authority in the Episcopal Church. Contrary to what Bishop Dixon claims, say Defendants, a higher ecclesiastical authority exists vis-a-vis the actions of a diocese and bishop and that is the ecclesiastical review panel that, according to Church canons, may be convened by the House of Bishops. Review by such a panel is initiated if three bishops in good standing in the Church charge a bishop with a violation of the national Canons. The panel may subject the bishop complained of to a disciplinary process that can ultimately result in the bishop's admonishment, suspension, or defrocking.

This argument has particular vitality in the present case, say Defendants, because shortly after suit was filed, three bishops in good standing in fact filed charges against Bishop Dixon alleging violations of Church canons.[18] They complained, in essence, that Bishop Dixon abused her authority by attempting to disapprove of Father Edwards as Rector at St. John's beyond the time she was permitted to do so under Church Canons, the apparent implication being that, pending the decision of the higher review panel, Defendants would have no obligation to abide by the Bishop's decision.

Bishop Dixon supplies what the Court concludes is a fully dispositive reply.

First, by decision issued on September 5, 2001, the "Disciplinary Review Committee" to which the charges of the three bishops and the lay communicants were preferred, decided that Bishop Dixon had acted properly:

> The Complainants and the Respondent Bishop hold different views as to the meaning, purpose and operation of Canon III.17.2 and 3. Both parties apparently hold these views in good faith and with the support of their advisors and canonical commentators. The duty of the Review Committee at this point is to assume that the facts alleged by the charges are true and, based on those facts, to determine if an Offense under the Canons may have occurred. Canon IV.3.40.

> The Review Committee believes that Bishop Dixon's actions were based on a reasonable interpretation of the canons. They are not contrary to definitive canonical authority. Under these circumstances, the Review Committee does not believe that the requisite elements of intention, materiality and meaningfulness are present which would subject Bishop Dixon to presentment on these charges.

> THEREFORE, the Title IV Review Committee has determined that, taking the facts alleged to be true, no Offense has occurred under the Canons of The Episcopal Church.

Although Defendants indicate that they plan a further appeal in the matter, arguably the proposition that the review panel is the highest ecclesiastical authority in the Church is moot.

---

18. In addition to the charges filed by the three Bishops, identical charges against Bishop Dixon were filed by two priests, one of whom was canonically resident in the Diocese of Washington, and more than ten adult communicants in good standing in the Diocese. This is an alternate method of bringing charges against a bishop before an ecclesiastical review panel.

But accepting for the moment that the panel (or any entity that might review the decision of the review panel) is a higher ecclesiastical authority than the Bishop, there is a second reason why Bishop Dixon is not precluded from seeking relief in this Court. Unless and until that higher authority might act, there is no basis for presuming that, in the interim, the decision of a bishop is anything other than regular and correct or that it should be stayed or suspended. Defense counsel conceded at oral argument that an appeal to a review panel does not have a suspensory effect, nor indeed that any precedent exists for the panel itself to issue a stay of a bishop's decision pending its review. In other words, giving Defendants the benefit of their argument, as far as Father Edwards and the Vestry of St. John's are concerned, until a review panel (or a panel reviewing a decision of a review panel) holds to the contrary, Bishop Dixon represents the highest ecclesiastical authority of the Church. Were it otherwise, no decision of a bishop would ever have binding effect, given the theoretical possibility that disciplinary charges might be filed against the bishop by a few individuals who disagreed with him or her. The result, to put it mildly, would be considerable disorder within the Church.

Ultimately, however, Defendants' suggestion that the Bishop is not the highest ecclesiastical authority is contradicted by every fundamental aspect of the faith, beginning with the very word "bishop," which is derived from the Late Latin "episcopus" meaning "bishop" or "overseer," through the Greek "episcopus," comprised of "epi," meaning "on or over" and "skopos," meaning "watches." [19]

Professor Lewis Weil, Professor of Liturgics at the Church Divinity School of the Pacific in Berkeley, California, has stated on affidavit that the diocesan bishop is at the "apex" of the Episcopal Church hierarchy "as the apostle, chief priest, pastor and ecclesiastical authority of the diocese." This is established in by the Catechism, or Outline of Faith, in the Book of Common Prayer. BCP 855.[20] According to the Book of Common Prayer, a priest is required to share his or her ministry with the bishop because a priest's ministry is derivative of the bishop. BCP 856. As a result, in the ordination rites for a priest, the ordinand must vow "in accordance with the canons of this Church, [to] obey [his or her] bishop or other ministers who may have authority over [him or her] and [his or her] work." BCP 526. The ordinand must also vow to "respect and be guided by the pastoral direction and leadership of [his or her] bishop." BCP 532. At the church service celebrating a priest's induction as a rector, the bishop reads his or her letter of institution to the rector-elect which says:

> (Y)ou have been called to work together with your bishop and fellow presbyters as a pastor, priest and teacher and to take your share in the councils of the Church ... This letter is a sign that you are fully empowered and authorized to exercise this ministry, accepting its privileges and responsibilities as a priest of this Diocese, in communion with your Bishop.

BCP 557

Further, insofar as the bishop is "apostle" of a diocese, he or she is, according to church doctrine, the direct descendant of the apostles who were the personal messengers directly commissioned by Jesus to transmit his Word. As stated in the Book

---

**19.** See *Webster's Unabridged Dictionary* 213 (2d. ed.1998) (defining "bishop").

**20.** References to *The Book of Common Prayer* (1979) are cited hereinafter as "BCP ___"

of Common Prayer, "the order of bishops ... carry on the apostolic work of leading, supervising and uniting the Church." BCP 510. The bishop shares a "heritage" with the "patriarchs, prophets, apostles and martyrs, and those of every generation who have looked to God in hope." BCP 517.

The bishop is also is the sacramental provider of the Episcopal Church. Among the sacraments of the Church is the Holy Eucharist. As to this, the Book of Common Prayer indicates "it is the bishop's prerogative, when present, to be the principal celebrant at the Lord's table and to preach the Gospel." BCP 322.

Finally, Professor Weil cites a letter from St. Cyprian, an early Church father, to the effect that "the Church is the people united to the bishop, the flock clinging to its shepherd. From this you should know that the bishop is in the Church, and the Church in the bishop."

These roles, taken together—apostle, chief priest, and pastor of the diocese—as well as the vow taken by every priest upon ordination signify the hierarchical nature of the Episcopal Church and establish the bishop as "the cornerstone of the diocese." "The history and liturgy of the Episcopal Church," Professor Weil concludes, "support the notion that the bishop is the ultimate authority over ecclesiastical matters within his or her diocese."

Again, whatever their historical speculations may be, Defendants and their canon law experts take no genuine issue with these basic propositions.

All of this, in the Court's view, gives a conclusive quietus to any argument about the role of review panels within the

Church or whether Bishop Dixon may have had certain ecclesiastical remedies that she declined to pursue before coming to court.

■ She is the highest ecclesiastical authority of the Washington Diocese of the Episcopal Church. She has made certain interpretations of canon law regarding her entitlement to access to and activities within St. John's Parish. Even if her decisions regarding the number of times she may visit, preach the Word, and give communion were arbitrary (and the Court in no way means to suggest they were), they were decisions for her, as Bishop, to make. The Court had and has no say in the matter.

Similarly, Bishop Dixon has interpreted the canons relative to the calling of Father Edwards to the rectorship of St. John's Parish. Even if her decision was arbitrary (repeating, for the record, that the Disciplinary Review Committee clearly held it was not), the Court would still have no say in the matter. By law, the Court must defer to her decisions.

On the other hand, given that Bishop Dixon has been denied access to Christ Church, given that her entry into the Church has been physically barred, that she has been told that she may not give communion and that she may not preach there, she is entitled to a remedy from the civil court, to assure her access.[21]

Similarly, given that Father Edwards, supported by the Vestry, remains in the rectory at St. John's, holding himself out as rector and officiating at services despite Bishop Dixon's refusal to confirm him as rector, she is entitled to relief from the civil court. Civil authorities have inter-

---

**21.** See Fn. 13, *supra.*

vened to grant injunctive relief to bishops in a number of comparable situations. In *Protestant Episcopal Church v. Graves, supra,* for example, an Episcopal priest was denied the right to "perform any priestly function in the Diocese of New Jersey" by the diocesan bishop. 391 A.2d at 566. The priest, however, continued to conduct services in the parish and denied the priest designated by the bishop the right to officiate there. *Id.* The Church sought, *inter alia,* a preliminary injunction "removing Rev. Graves from the rectory of St. Stephen's and prohibiting him from entering St. Stephen's Church or parish house except to attend religious services or other events approved by the Diocese." *Id.* at 567. On these facts, the New Jersey court determined that the Church was "entitled to the relief sought as a matter of law." *Id.* at 577. Its award of summary judgment in favor of the Church rendered preliminary injunctive relief unnecessary. *Id.* at 568, 577.

The case of *Fiske v. Beaty,* 120 Misc. 1, 198 N.Y.S. 358 (1922), *aff'd in part and rev'd in part on other grounds,* 206 A.D. 349, 201 N.Y.S. 441 (3d Dep't 1923), *aff'd,* 238 N.Y. 598, 144 N.E. 907 (1924), involved similar circumstances. There, an Episcopal bishop and a priest who claimed to be rector of a parish were at loggerheads regarding provisions of the Canons of the Church concerning the calling of a rector. The court deferred to the decision of the bishop denying the priest's status as rector and granted the bishop's request for injunctive relief. 120 Misc. at 21, 198 N.Y.S. at 373–74.

In its decision today, the Court does nothing more than follow these well-established precedents.

22. See Fn. 4, *supra.*

Bishop Dixon's Motion for Summary Judgment will be GRANTED and Defendants' Motion to Dismiss will be DENIED.[22]

V.

Accordingly, the Court ADJUDGES, ORDERS, and DECLARES as follows:

a) Bishop Jane Holmes Dixon or her delegate has the right to be present in the buildings and on the grounds of St. John's Parish and to perform the duties of Bishop and Rector *Ex Officio* there; and her actions on May 27, 2001 did not, and similar future actions by her or her delegate will not, constitute trespass;

b) Bishop Dixon has the right to preside at meetings of the Vestry and Parish of St. John's;

c) The purported contract between the Vestry of St. John's Parish and Father Edwards engaging him as Rector of the St. John's Parish is invalid, null and void, unenforceable and without effect;

d) The acts of the Vestry of St. John's Parish in contracting with Father Edwards to be and holding him out as Rector of St. John's Parish and in preventing Bishop Holmes from presiding at vestry meetings and performing other acts as Rector *Ex Officio* of St. John's are *ultra vires* and of no force and effect;

e) Under the Maryland Vestry Act, 1976 Laws of Md. Ch. 96, § 312J, Father Edwards is not Rector of Christ Church, St. John's Parish; and

f) Under the Maryland Vestry Act, 1976 Md. Laws Ch. 96, § 312G, Father Ed-

wards is unlawfully using and occupying the buildings and property of St. John's Parish.

Father Samuel L. Edwards and the Vestry of St. John's Parish, Accokeek, Maryland, will therefore be ENJOINED as follows:

a) They shall take no actions, directly or indirectly, to prevent Bishop Dixon or her delegate from performing her duties at St. John's Parish, including officiating at services and administering to its congregation, and presiding at the meetings of the Vestry and Parish of St. John's;

b) Father Edwards shall not officiate at religious services on or near the grounds of St. John's Parish;

c) Father Edwards shall take no actions as Rector of St. John's Parish, including, but not limited to, presiding at meetings of the Vestry or officiating at services of St. John's Parish;

d) Father Edwards shall not use or occupy the buildings or grounds of St. John's Parish; and

e) Except for his vacating of the rectory at St. John's Parish, which he may take up to ten (10) days from this Order to accomplish, this injunction shall take effect immediately.